Carolyn J. Johnsen
Texas Bar No. 19844600
William L. Novotny (admitted pro hac vice)
Arizona Bar. No. 004239
Amanda E. Newman (admitted in N.D. Tex.)
Arizona Bar No. 032462
Kathryn E. Gasior (admitted in N.D. Tex.)
Arizona Bar No. 037062
**DICKINSON WRIGHT PLLC**
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
Telephone: (602) 285-5000
Facsimile: (844) 670-6009
cjjohnsen@dickinsonwright.com
wnovotny@dickinsonwright.com
anewman@dickinsonwright.com
kgasior@dickinsonwright.com
*Counsel for the Plaintiff Trustee of the*
*Fresh Acquisitions Liquidating Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| FRESH ACQUISITIONS, LLC, *et al*., | Case No. 21-30721 (SGJ) |
| Debtors. | (Jointly Administered) |
| DAVID GONZALES, TRUSTEE OF THE FRESH ACQUISITIONS LIQUIDATING TRUST, | **Adv. No. 22-03087 (SGJ)** |
| Plaintiff, | |
| v. | **VERIFIED FIRST AMENDED COMPLAINT** |
| ALLEN JACKIE JONES, a single man, JASON RICHARD KEMP, a married man, LAWRENCE FARRELL HARRIS and RACHEL HARRIS, a married couple, VITANOVA BRANDS, LLC, a Texas limited liability company, TXFMP MANAGEMENT, LLC, a Texas limited liability company, DAYSPRING OPERATING COMPANY, LLC, a Texas | |

limited liability company, ALL JONES, LLC, a Texas limited liability company, LARRAC INV., LLC, a Texas limited liability company, MARTIN CORTES, a single man, NATHAN CALVERT, a single man, ALAMO FURR'S, LLC, a Texas limited liability company, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., a South Carolina professional corporation, ALAMO DYNAMIC, LLC d/b/a DYNAMIC FOODS, a Texas limited liability company, TROPICALE FOODS, LLC, a California limited liability company, AGNL SCOOP L.P., a Delaware limited partnership, AB REAL ESTATE, LLC, a Texas limited liability company, COUNTER-FORM LLC, a Wisconsin limited liability company; Q LIN PROPERTIES, LLC, a Missouri limited liability company, UCT168 LLC, a Tennessee limited liability company;

Defendants.

Plaintiff David Gonzales, Liquidating Trustee (the "Plaintiff" or the "Trustee") on behalf of the Fresh Acquisitions Liquidating Trust (the "Trust"), by its undersigned attorneys, alleges as follows for his Verified Complaint against Defendants:

**PREFATORY STATEMENT**

1.      For years, the Debtors in this case were misused by their majority owners, Defendants Allen Jackie Jones ("Jones"), Jason Richard Kemp ("Kemp"), and Lawrence Farrell "Larry" Harris Jr. ("Harris") (collectively, the "Owners"). The Owners used the Debtors as their personal piggybanks. The Owners drained the Debtors of their assets. The Owners used the Debtors for fraud and improper purposes, including the misuse of millions of dollars in COVID-19 relief funds that were supposed to be spent on employees and lease payments and instead enriched the Owners.

2.      Even while the buffet restaurant industry was going downhill and it was clear that the

Debtors, which ran chains of buffet restaurants, were insolvent, the Owners continued to take large salaries and distributions and held off on filing for bankruptcy, creating a situation of deepening insolvency for the Debtors. In governing the Debtors, the Owners ignored the best interests of the Debtors, and they ignored the interests of creditors.

3.      Employees, landlords, vendors, multiple taxing authorities, and the federal government all went unpaid while the Owners lined their pockets and misrepresented the Debtors' financial situation.

4.      The Owners sometimes acted directly, sometimes acted through their personal entities, and sometimes acted through other entities they controlled, which they appointed as "managers" of the Debtors. But it was the Owners pulling the strings.

5.      The Owners' lack of respect for the Debtors' corporate forms was evident. The Owners (and the entities they controlled) failed to maintain separate records for the Debtors. The Owners (and the entities they controlled) failed to file tax returns for the Debtors for years, resulting in massive claims by the Internal Revenue Service and state taxing authorities. The Owners (and the entities they controlled) moved the Debtors' assets around, without consideration, like chess pieces. The Owners caused the Debtors to pay exorbitant purported management fees — far more than the management contracts provided for — to Defendants TXFMP Management, LLC ("TXFMP") and VitaNova Brands, LLC ("VitaNova"), both of which were also controlled by the Owners for the Owners' benefit.

6.      The misconduct continued even after the Debtors filed their bankruptcy petitions in this action. VitaNova (controlled by the Owners) continued to receive management fees but did not provide management services. VitaNova (controlled by the Owners) failed and refused to provide the financial information necessary for the Debtors to comply with bankruptcy rules and procedures. VitaNova (controlled by the Owners) attempted a sham purchase of the Debtors' assets. VitaNova

(controlled by the Owners) submitted materially false information in Schedules and Monthly Operating Reports, likely to conceal the Owners' fraud and misuse of the Debtors. VitaNova (controlled by the Owners) withheld relevant information from the Court and creditors. VitaNova (controlled by the Owners) commingled Debtor documents with those of non-Debtor entities and withheld those documents for months, in violation of their contractual <u>and</u> Plan-based duties.

7.      In an episode that highlighted their lack of respect for the Debtors' assets, the interests of creditors, and their own duties, the Owners — both shortly before and <u>during the bankruptcy</u> — caused the Debtors to improperly use Paycheck Protection Program ("PPP") funding to pay a $1.85 million settlement payment that benefitted the Owners — and then they <u>concealed or omitted those payments from the Debtors' bankruptcy Schedules</u>. Similarly, the Owners diverted more than $3 million in Debtor PPP funding to themselves, seemingly to pay their personal loans.

8.      This lawsuit addresses the egregious misconduct by the Owners, their personal entities (Defendants All Jones, LLC, Dayspring Operating Company, LLC, and Larrac Inv., LLC), other entities they control (including TXFMP and VitaNova), and their accomplices (including Martin Cortes and Nathan Calvert), as well as related acts by others. The Defendants are liable for their misconduct, which caused substantial damages to the Debtors, the Estate, and creditors.

<u>**PARTIES, JURISDICTION, AND VENUE**</u>

9.      This Court has subject matter jurisdiction over this adversary proceeding, which arises under Title 11 of the United States Code (the "Bankruptcy Code") and arises in and relates to a case under the Bankruptcy Code pending in the United States Bankruptcy Court for the Northern District of Texas, Case No. 21-30721 (SGJ), under 28 U.S.C. §§ 157(b)(2) & 1334.

10.     This is a core proceeding under 28 U.S.C. § 157(b). Plaintiff consents to entry of a final judgment by this Court with respect to the allegations and matters presented herein.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 & 1409(a).

12.     This adversary proceeding is commenced pursuant to Rule 7001(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Section 105(a) of Bankruptcy Code.

13.     Pursuant to the Plan and Confirmation Order (each as defined below), this Court retained jurisdiction after the Effective Date (as defined below): (a) as to all proceedings and other matters arising in or relating to this Bankruptcy Case, including any adversary proceedings commenced after the Effective Date, and (b) in order to hear and determine any rights held by or accruing to the Trust pursuant to the Plan, this Bankruptcy Case, or any federal or state statute or legal theory.

14.     Debtor Alamo Fresh Payroll, LLC ("Alamo Fresh Payroll") is a Texas limited liability company ("LLC"). At relevant times, its members and directors were Jones, Kemp, and Harris. On information and belief (including based on review of corporate filings, public records, and the Debtors' records), Jones, Kemp, and Harris held various positions of control over the entity (as members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

15.     Debtor Fresh Acquisitions, LLC ("Fresh") is a Delaware LLC. On information and belief (including based on review of corporate filings, public records, and the Debtors' records), Jones, Kemp, and Harris held various positions of control over the entity (as shareholders, managers, officers, and/or directors), directly or indirectly, at various relevant times.

16.     Debtor Alamo Ovation, LLC ("Alamo Ovation") is a Texas limited liability company ("LLC"). At relevant times, its members and directors were Jones, Kemp, and Harris. On information and belief (including based on review of corporate filings, public records, and the Debtors' records), Jones, Kemp, and Harris held various positions of control over the entity (as members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

17.     Debtor Buffets, LLC ("Buffets") is a Minnesota LLC. At relevant times, Kemp was a manager of Buffets. On information and belief (including based on review of corporate filings,

public records, and the Debtors' records), Jones, Kemp, and Harris held various positions of control over the entity (as members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

18.  Debtor HomeTown Buffet, Inc. ("HomeTown Buffet") is a Minnesota corporation. At relevant times, Kemp was CEO of Hometown Buffet. On information and belief (including based on review of corporate filings, public records, and the Debtors' records), Jones, Kemp, and Harris held various positions of control over the entity (as shareholders, managers, officers, and/or directors), directly or indirectly, at various relevant times.

19.  Debtor Tahoe Joe's Inc. ("Tahoe Joe's") is a Minnesota corporation. At relevant times, Kemp was CEO of Tahoe Joe's. On information and belief (including based on review of corporate filings, public records, and the Debtors' records), Jones, Kemp, and Harris held various positions of control over the entity (as shareholders, managers, officers, and/or directors), directly or indirectly, at various relevant times.

20.  Debtor OCB Restaurant Company, LLC ("OCB Restaurant") is a Minnesota LLC. At relevant times, Jones was its president, Kemp was its treasurer and manager, and Harris was its chairman. On information and belief (including based on review of corporate filings, public records, and the Debtors' records), Jones, Kemp, and Harris held various positions of control over the entity (as members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

21.  Debtor OCB Purchasing, Co. ("OCB Purchasing") is a Minnesota corporation. At relevant times, Kemp was its CEO. On information and belief (including based on review of corporate filings, public records, and the Debtors' records), Jones, Kemp, and Harris held various positions of control over the entity (as shareholders, managers, officers, and/or directors), directly or indirectly, at various relevant times.

22.  Debtor Ryan's Restaurant Group, LLC ("Ryan's Restaurant") is a South Carolina

LLC. On information and belief (including based on review of corporate filings, public records, and

the Debtors' records), Jones, Kemp, and Harris held various positions of control over the entity (as

members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

23.    Debtor Fire Mountain Restaurants, LLC ("Fire Mountain Restaurants") is an Ohio

LLC. At relevant times, its directors and officers were Jones (president), Kemp (treasurer), and

Harris (chairman). On information and belief (including based on review of corporate filings, public

records, and the Debtors' records), Jones, Kemp, and Harris held various positions of control over

the entity (as members, managers, officers, and/or directors), directly or indirectly, at various

relevant times.

24.    Debtor Food Management Partners, Inc. ("Food Management Partners") is a Texas

corporation. At relevant times, its members and directors were Jones, Kemp, and Harris. On

information and belief (including based on review of corporate filings, public records, and the

Debtors' records), Jones, Kemp, and Harris held various positions of control over the entity (as

shareholders, managers, officers, and/or directors), directly or indirectly, at various relevant times.

25.    Debtor FMP SA Management Group, LLC ("FMP SA Management") is a Texas

LLC. At relevant times, its managers were Jones, Kemp, and Harris. On information and belief

(including based on review of corporate filings, public records, and the Debtors' records), Jones,

Kemp, and Harris held various positions of control over the entity (as members, managers, officers,

and/or directors), directly or indirectly, at various relevant times.

26.    Debtor FMP-Fresh Payroll, LLC ("FMP-Fresh Payroll") is a Texas LLC. At relevant

times, its managers were Jones, Kemp, and Harris. On information and belief (including based on

review of corporate filings, public records, and the Debtors' records), Jones, Kemp, and Harris held

various positions of control over the entity (as members, managers, officers, and/or directors),

directly or indirectly, at various relevant times.

27.     Debtor FMP-Ovation Payroll, LLC ("FMP-Ovation Payroll") is a Texas LLC. At relevant times, its managers and directors were Jones, Kemp, and Harris. On information and belief (including based on review of corporate filings, public records, and the Debtors' records), Jones, Kemp, and Harris held various positions of control over the entity (as members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

28.     Debtor Alamo Buffets Payroll, LLC ("Alamo Buffets Payroll") is a Texas LLC. At relevant times, its directors and managers were Jones, Kemp, and Harris. On information and belief (including based on review of corporate filings, public records, and the Debtors' records), Jones, Kemp, and Harris held various positions of control over the entity (as members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

29.     Alamo Fresh Payroll, Fresh, Alamo Ovation, Buffets, HomeTown Buffet, Tahoe Joe's, OCB Restaurant, OCB Purchasing, Ryan's Restaurant, Fire Mountain Restaurants, Food Management Partners, FMP SA Management, FMP-Fresh Payroll, FMP-Ovation Payroll, and Alamo Buffets Payroll are all debtors in these consolidated cases and are collectively referred to herein as the "Debtors."

30.     On April 20, 2021 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code; those proceedings remain pending.

31.     The Trust was formed as of January 3, 2022, which was the "Effective Date" of *The Official Committee of Unsecured Creditors' First Amended Joint Chapter 11 Plan of Liquidation* filed on October 30, 2021 (the "Plan"), [Administrative Docket No. 498], which was confirmed pursuant to the *Findings of Fact, Conclusions of Law, and Order (I) Approving Disclosure Statement on a Final Basis and (II) Confirming The Official Committee of Unsecured Creditors' First Amended Joint Chapter 11 Plan of Liquidation* entered on December 20, 2021 (the "Confirmation Order") [Administrative Docket No. 587].

32.     In accordance with the terms of the Plan and the Confirmation Order, on the Effective Date, the Trustee was granted the rights and powers of a debtor in possession under Bankruptcy Code Section 1107 and such other powers, rights, and duties to effectuate the provisions of the Plan.

33.     In addition, in accordance with the terms of the Plan, the Confirmation Order, and the Fresh Acquisition Liquidating Trust Agreement (the "Trust Agreement") [Administrative Docket No. 499], on the Effective Date, (a) all Causes of Action[1] of the Debtors were vested in the Trust, and the Trustee was conferred with standing to bring and prosecute the Causes of Action vested and transferred to the Trust on behalf of the Trust; and (b) all of the Debtors' assets as provided in Section 541of the Bankruptcy Code were transferred to and vested in the Trust.

34.     Defendant Allen Jackie Jones ("Jones") is, on information and belief, a single man, who, on information and belief (based on review of Debtor records and public records), is a resident of Texas and does business in Texas. As described herein, Jones held various positions of ownership and/or control over the Debtors, directly or indirectly, at various relevant times, and he is an Insider[2] of the Debtors.

35.     Defendant Jason Richard Kemp ("Kemp") is a married man who, on information and belief (based on review of Debtor records and public records), is a resident of Texas and does business in Texas. As described herein, Kemp held various positions of ownership and/or control over the Debtors and Defendant VitaNova Brands, LLC ("VitaNova"), directly or indirectly, at various relevant times, and he is an insider of the Debtors. His wife, Tara Kemp, may have participated in some of the events described herein or received some of the property or benefits alleged herein; the Trustee will seek leave to amend to add her as a defendant if and when he discovers such facts.

---

[1] This phrase uses the definition in the Plan.
[2] "Insider" is used in this Verified Complaint as defined in 11 U.S.C. § 101.

36.    Defendants Lawrence Farrell "Larry" Harris Jr. ("Harris") and Rachel Harris are a married couple who, on information and belief (based on review of Debtor records and public records), are residents of Texas and do business in Texas. As described herein, Harris held various positions of ownership and/or control over the Debtors and VitaNova, directly or indirectly, at various relevant times, and he is an Insider of the Debtors. Rachel Harris is, with Harris, a manager of Defendant Larrac Inv., LLC ("Larrac"), which (directly or indirectly) owned and/or controlled various Debtors, benefitted from transfers challenged herein, and participated in acts and omissions alleged herein. On information and belief (based on review of Debtor records and other information, as described herein), Rachel Harris, through her involvement in controlling Larrac, participated in the acts and omissions alleged herein; all allegations against Larrac are alleged against her.

37.    Defendant VitaNova Brands ("VitaNova") is a Texas limited liability company. On information and belief, its members include citizens of Texas, and it does business in Texas. At relevant times and, on information and belief (including based on review of corporate filings, public records, and the Debtors' records), as of the filing of the Verified Complaint, VitaNova's directors were and are Jones, Kemp, Harris, and Brian Padilla ("Padilla"); Kemp is its President, Harris is its Chairman, and Jones and Padilla are its members. VitaNova is an Insider of the Debtors.

38.    Defendant TXFMP Management, LLC ("TXFMP") is a Texas limited liability company. On information and belief, its members include citizens of Texas, and it does business in Texas. At relevant times and, on information and belief (including based on review of corporate filings, public records, and the Debtors' records), as of the filing of the Verified Complaint, TXFMP's directors were and are All Jones, LLC (a company owned and/or controlled by Jones), Dayspring Operating Company, LLC (a company owned and/or controlled by Kemp), and Larrac Inv., LLC (a company owned and/or controlled by Harris and Rachel Harris); All Jones, LLC is its president. TXFMP is an Insider of the Debtors.

39.     Defendant Dayspring Operating Company, LLC ("Dayspring") is a Texas limited liability company. On information and belief, its members include citizens of Texas, and it does business in Texas. At relevant times and, on information and belief (including based on review of corporate filings, public records, and the Debtors' records), as of the filing of the Verified Complaint, Dayspring's director and manager was Kemp, and Kemp owned and/or controlled the company. Dayspring is an Insider of the Debtors.

40.     Defendant All Jones, LLC ("All Jones") is a Texas limited liability company. On information and belief, its members include citizens of Texas, and it does business in Texas. At relevant times and, on information and belief (including based on review of corporate filings, public records, and the Debtors' records), as of the filing of the Verified Complaint, All Jones' manager was Jones, and Jones owned and/or controlled the company. All Jones is an Insider of the Debtors.

41.     Defendant Larrac Inv., LLC ("Larrac") is a Texas limited liability company. On information and belief, its members include citizens of Texas, and it does business in Texas. At relevant times and, on information and belief (including based on review of corporate filings, public records, and the Debtors' records), as of the filing of the Verified Complaint, Larrac's managers were Harris and Rachel Harris, and Harris and Rachel owned and/or controlled the company. Larrac is an Insider of the Debtors.

42.     Defendant Martin Cortes ("Cortes") is, on information and belief, a single man, who, on information and belief (based on review of Debtor records and public records), is a resident of Texas and does business in Texas. As described herein, Cortes held various positions of control over the Debtors, including, at relevant times, acting as Chief Financial Officer of VitaNova, as well as of Food Management Partners and the other Debtors.

43.     Defendant Nathan Calvert ("Calvert") is, on information and belief, a single man, who, on information and belief (based on review of Debtor records and public records), is a resident

of Texas and does business in Texas. As described herein, Calvert held various positions of control over the Debtors and VitaNova, including, at relevant times, acting as Vice President - Controller of VitaNova as well as of Food Management Partners and the other Debtors.

44.     Defendant Alamo Furr's, LLC ("Alamo Furr's") is a Texas limited liability company. On information and belief, its members include citizens of Texas, and it does business in Texas. At relevant times and, on information and belief (including based on review of corporate filings, public records, and the Debtors' records), as of the filing of the Verified Complaint, Alamo Furr's managers and directors are Jones, Kemp, and Harris. Alamo Furr's is an Insider and Affiliate[3] of the Debtors.

45.     Defendant Ogletree, Deakins, Nash, Smoak & Stewart, P.C. ("Ogletree") is a North Carolina professional corporation. On information and belief, it does business in Texas.

46.     Defendant Alamo Dynamic, LLC d/b/a Dynamic Foods ("Alamo Dynamic") is a Texas limited liability company. On information and belief, its members include citizens of Texas, and it does business in Texas. At relevant times and, on information and belief, as of the filing of the Verified Complaint, Alamo Dynamic's manager was Alamo Furr's. Alamo Dynamic is an Insider and Affiliate of the Debtors.

47.     Defendant Tropicale Foods, LLC ("Tropicale Foods") is a California limited liability company. It does business in Texas, including, without limitation, that it owned real property in Texas that is a subject of this lawsuit.

48.     Defendant AGNL Scoop, L.P. ("AGNL Scoop") is a Delaware limited partnership. It does business in Texas, including, without limitation, that it owns real property in Texas that is a subject of this lawsuit.

49.     Defendant AB Real Estate, LLC ("AB Real Estate") is a Texas limited liability company. On information and belief, its members include citizens of Texas, and it does business in

Texas. At relevant times and, on information and belief (including based on review of corporate filings, public records, and the Debtors' records), as of the filing of the Verified Complaint, AB Real Estate's managers are Jones, Kemp, and Harris. AB Real Estate is an Insider and Affiliate of the Debtors.

50.     Defendant Counter-Form LLC ("Counter-Form") is a Wisconsin limited liability company. It owns real property that is a subject of this lawsuit.

51.     Defendant Q Lin Properties, LLC ("Q Lin Properties") is a Missouri limited liability company. It owned real property that is a subject of this lawsuit.

52.     Defendant UCT168 LLC ("UCT168") is a Tennessee limited liability company. It owns real property that is a subject of this lawsuit.

## GENERAL ALLEGATIONS

53.     The Debtors are related companies that historically owned and operated various chains of buffet restaurants, such as those operating under the Furr's Fresh Buffet™, Country Buffet™, Old Country Buffet™, HomeTown Buffet™, Tahoe Joe's™, Ryan's™, and Fire Mountain™ brands.

54.     Those companies have struggled financially for years. The Debtors (in various iterations) previously filed for Chapter 11 bankruptcy in 2008, 2012, and 2016.

55.     On information and belief, including based on review of the Debtors' records and their bankruptcy filings (both in the current bankruptcy and in those prior bankruptcies), as well as based on the creditors' claims in this case, the Debtors have been insolvent consistently or nearly consistently since at least 2015.

56.     The ultimate ownership group at the time of the instant bankruptcy — Jones, Kemp, Harris, and, to a lesser extent, Brian Padilla ("Padilla") — acquired ownership interests in the

---

[3] "Affiliate" is used in this Verified Complaint as defined in 11 U.S.C. § 101.

Debtors in or around 2015.

57.    Saddled with excessive management fees, mismanagement, and ownership that used the Debtors as their personal piggybanks, the Debtors were not successful under the Owners' control.

58.    The Owners caused various of the Debtors to file for bankruptcy in March 2016. After shedding more than $100 million in creditor claims through a plan of reorganization, the Owners repurchased those Debtors' assets in mid-2017 for the modest sum of $6.5 million and continued to abuse the entities for their benefit.

59.    The COVID-19 pandemic, which reared its head in 2020, was the final straw for the already-failing Debtors. With disruptions to restaurant operations and a particular consumer reticence toward buffet-style dining, the Debtors were unable to continue.

60.    Unfortunately, that obvious reality did not stop various Defendants from continuing to bleed the Debtors dry — including draining them of funds that were owed to employees, landlords, and other creditors.

61.    The Owners (acting at times through VitaNova) finally decided in 2021 that it was time for another bankruptcy, and they attempted to use this proceeding as they did the one in 2016: rid the Debtors of creditor claims and then repurchase their assets on the cheap and keep operating as before. In short, exploit the bankruptcy system for their benefit.

62.    Unfortunately for the Owners and their Affiliates, the music for their serial bankruptcy strategy stopped. The Debtors were liquidated instead of reorganized, and the Owners' and their Affiliates' malfeasance came to light.

**A.    Structure, Consolidated Operations, and Treatment of the Relevant Companies**

63.    The Debtors were part of a complicated web of business entities created and/or maintained to benefit their ultimate owners — primarily, Jones, Kemp, and Harris.

64.    On information and belief (based on review of corporate filings and Debtor records),

relevant portions of the Debtors' organizational structure, at certain (but perhaps not all) relevant times, included the following (Debtors are outlined in **bold**):







65.     On information and belief (including based on review of Debtor records and corporate

filings), the business empire that included the Debtors and their Affiliates consisted of <u>more than 250</u>

separate business entities registered in various states throughout the country, but all operating out of

the same address in San Antonio, Texas.

66.     The Owners (as well as their entities, including without limitation TXFMP and

VitaNova) used this overly complicated web of entities to avoid personal liability, conceal their

business activities, and perpetrate fraud.

67.     At relevant times, the Owners collectively held a controlling interest in each of the

Debtors.

68.     The Debtors' bankruptcy petitions identified the Owners as "Governing Persons" of

the Debtors.

69.     Notwithstanding the fact that Padilla and a couple of others had partial (direct or

indirect) ownership interests in some of the Debtors, the Owners were in control. They made most or all material decisions for the Debtors, they had the ability to completely control the Debtors — and they in fact exercised that ability — and they used the Debtors for their personal benefit.

70.     The Debtors were completely controlled by the same group of individuals, including the Owners, as well as the Owners' entities (including All Jones, Dayspring, Larrac, TXFMP, and VitaNova) and associates (including Cortes and Calvert). Rachel Harris, as a co-manager of Larrac, also participated in such control, and is included in all allegations about such control.

71.     The Debtors acted through their management companies (at relevant times, TXFMP and VitaNova), who were, in turn, controlled by the Owners. The Debtors did not take any actions that were not controlled by the Owners (acting directly or through TXFMP, VitaNova, or their personal entities), assisted by others, such as Cortes and Calvert, who helped the Owners use the Debtors to accomplish their purposes.

72.     Evidencing the lack of formalities recognized for the Debtors, as well as their alter ego characteristics, individuals who held positions within the empire — such as Cortes and Calvert — usually did so formally with Food Management Partners (as was reflected in their email signature blocks) but acted in the same position with respect to all of the Debtors.

73.     For example, Cortes was Chief Financial Officer of Food Management Partners and all the other Debtors, as well as of VitaNova.

74.     Calvert was formerly a financial analyst for the Debtors. In or around 2020, as the Debtors' ship began to sink, he was abruptly elevated to be Vice President - Controller of Food Management Partners and all the other Debtors, as well as of VitaNova.

75.     Cortes and Calvert also held those same positions with VitaNova: Cortes was VitaNova's Chief Financial Officer, and Calvert was VitaNova's Vice President - Controller.

76.     Cortes' and Calvert's parallel positions with all the Debtors and with VitaNova are

another example of and are indicative of the alter ego way in which the Owners operated the Debtors and their other companies.

77.     Those parallel positions also allowed Cortes and Calvert to continue to mismanage the Debtors, and continue to do the Owners' bidding, even during the bankruptcy proceeding (*see* discussion below, about VitaNova's mismanagement of the Debtors during the bankruptcy).

78.     The Owners and those who acted in concert with them (including, without limitation, All Jones, Dayspring, Larrac, Rachel Harris, TXFMP, VitaNova, Cortes, and Calvert), did not use or respect the Debtors as separate entities. Rather, they treated the Debtors as parts of a mass of companies without separate or distinct characteristics.

79.     The Debtors (as well as many of their Insiders and Affiliates) all operated out of the same principal place of business, at 2338 N. Loop 1604 W., Suite 350, San Antonio, TX 78248-4544.

80.     The Debtors had the same ultimate owners, members, managers, directors, and/or officers — primarily, the Owners.

81.     The Debtors were inadequately capitalized. This is evidenced by, inter alia, their serial bankruptcies.

82.     The Debtors shared employees, accounting services, accounts payable systems, software systems, and risk management services. They generally used the same email domain.

83.     Indeed, the authorization for the Debtors' bankruptcy petitions in this proceeding came via a single "Omnibus Written Consent in Lieu of Meetings of the Boards of Directors and Boards of Managers," attached to each bankruptcy petition, that was signed by the Owners as "Governing Persons" for each Debtor. This document is exemplar of the way the Owners treated the Debtors: the Debtors were treated as a single, cohesive whole, rather than as separate entities.

84.     The Debtors' finances were operated in conjunction. For example, debts were

generally centralized and paid by one Debtor entity.

85.     On information and belief (including based on the record in the bankruptcy case), unsecured creditors viewed the Debtors as a single entity when extending credit terms.

86.     At all relevant times, there was such a unity of interest between and among each of the Debtors, on one hand, and the Owners (individually or through All Jones, Dayspring, and Larrac), TXFMP, and VitaNova, on the other hand, that those Defendants treated and used the Debtors as their alter egos, such that any separateness between them ceased to exist, and those Defendants completely controlled, dominated, managed, and operated the Debtors and their related entities to suit their convenience.

87.     The Owners, TXFMP, and VitaNova commingled the Debtors' assets.

88.     Peter Donbavand ("Donbavand"), who was Vice President - Real Estate & Business Development for Food Management Partners and the other Debtors until April 20, 2020, testified at a deposition on March 5, 2021 that the Defendants "[took] all of the different businesses' moneys and commingled them together and are now paying all the bills out of one joint account." He testified that this conduct began in or around January 2020. [*Arthur N. Rupe Foundation v. Fresh Acquisitions, LLC*, N.D. Tex. Case No. 5:20-cv-00130-H, Remote Videotaped Dep. of Peter Donbavand (Mar. 5, 2021), relevant excerpts attached as <u>Exhibit 1</u> hereto, at 111, 113-14].

89.     Donbavand testified that the Owners began commingling so they could use money from other entities to prop up the failing Debtors, to avoid Arizona Bank & Trust calling a loan on which Fresh was liable, and which the Owners had guaranteed. [*Id.* at 113-14].

90.     The Owners, TXFMP, and VitaNova failed to keep separate records for the Debtors.

91.     Indeed, VitaNova, as manager for the Debtors immediately prior to and during the bankruptcy proceeding, was charged with keeping their records and documents. But when VitaNova produced those records and documents to the Trust, it did so by producing millions of documents and

records, some of which belonged to the Debtors and some of which belonged to non-Debtor Affiliate entities that VitaNova also managed. The documents were intermingled and not segregated by entity at all, making clear that VitaNova had not kept separate, segregated records for the entities it managed.

92.     The Owners, TXFMP, and VitaNova diverted the Debtors' assets for their personal use.

93.     The Owners, TXFMP, and VitaNova controlled the business and affairs of the Debtors and their Affiliates.

94.     The Owners, TXFMP, and VitaNova disregarded legal formalities of the Debtors and their Affiliates, and failed to maintain arm's-length relationships among the entities.

95.     The Owners, TXFMP, and VitaNova used the Debtors and their Affiliates as mere shells, instrumentalities, or conduits for themselves and/or their businesses.

96.     The Owners, TXFMP, and VitaNova manipulated the assets and liabilities between and among the Debtors and their Affiliates so as to concentrate the assets in certain entities and the liabilities in others.

97.     The Owners, TXFMP, and VitaNova used the Debtors and their Affiliates to conceal their ownership, management, and financial interests and/or personal business activities.

98.     The Owners, TXFMP, and VitaNova used the Debtors and their Affiliates to shield against personal obligations, including, without limitation, the claims filed in this case.

99.     The Debtors were substantively consolidated as per the Confirmation Order. [Administrative Docket No. 587, ¶ 14].

100.    Specifically, the Court found:

> Substantive consolidation is warranted because it is clear that while the Debtors in form had separate operating entities, in substance they historically operated on a consolidated basis. All Debtors as well as many

> non-debtor Affiliates generally have the same officers, managers, and directors. Cash and other assets were regularly commingled between and among the Debtors and their non-debtor Affiliates. Additionally, the Debtors were managed by the same insider owned management companies, shared general accounting services, shared software systems and risk management services. Numerous Creditors filed duplicative claims in several of the Debtor entity cases thus indicating they viewed the Debtors as a single entity. It appears that unsecured creditors viewed the Debtors as a single entity when extending credit terms, as such negotiations and agreements customarily provided for services to be rendered to multiple restaurant brands and locations owned by various Debtors, and the Debtors capitalized upon the scale and operations of the entirety of the Debtors' business operations to negotiate such agreements and maximize value. Further, all accounts payable functions were performed from one centralized location, by the same administrative staff working on behalf of all Debtors, and virtually all debts were centralized and paid by one of the Debtor entities.
>
> Determining the sources of the Debtors' pre-petition assets and liabilities on a per-entity basis would involve the nearly impossible task of reviewing and categorizing records of thousands of individual transactions to trace such transactions back to the proper entity.

[*Id.*].

101.    On information and belief (including based on review of corporate filings, public records, and the Debtors' records), Kemp operated largely through Dayspring, Jones operated largely through All Jones, and Harris and Rachel Harris operated largely through Larrac (including, as to each, engaging in the acts and omissions alleged herein <u>through those entities</u> and receiving transfers alleged herein <u>through those entities</u>); and Kemp, Jones, and the Harrises also used those entities as their alter respective egos.

102.    On information and belief, much of the conduct of and receipt of transfers by Kemp, Jones, and Harris (as well as Rachel Harris) that is alleged herein was done through Dayspring, All Jones, and Larrac, respectively.

**B.    Management Agreements**

103.    The Debtors were day-to-day managed pursuant to a series of management

agreements.

104.   The management agreements were not the result of arm's-length negotiations, because the Owners caused the Debtors to hire Insiders and Affiliates as their managers.

105.   In effect, the Owners had their left arm (the Debtors) negotiate with their right arm (other Owner-controlled entities) for these management agreements.

106.   In 2015, FMP SA Management (indirectly owned and controlled by Jones, Kemp, and Harris) contracted to provide day-to-day management services to most of the Debtors.

107.   Specifically, Buffets and FMP SA Management entered a Management Agreement dated August 9, 2015, for FMP SA Management to provide day-to-day management services to Buffets and its subsidiaries, for a weekly fee of 4% of Buffets' net consolidated revenues (the "2015 Buffets-FMP SA Management Agreement").

108.   Fresh and FMP SA Management also entered an Amended and Restated Management Agreement dated August 18, 2015, for FMP SA Management to provide day-to-day management services to Fresh, for a fee of 2% of Fresh's net consolidated revenues, payable every two weeks (the "2015 Fresh-FMP SA Management Agreement").

109.   In 2017, TXFMP assumed day-to-day management services for Buffets and its subsidiaries.

110.   Specifically, Buffets and TXFMP entered a Management Agreement dated 2017 for TXFMP to provide day-to-day management services to Buffets and its subsidiaries, for a weekly fee of 4% of Buffets' net consolidated revenues (the "2017 TXFMP Management Agreement").

111.   Later, VitaNova assumed day-to-day management services for both Fresh and Buffets and its subsidiaries.

112.   First, VitaNova succeeded FMP SA Management as the manager of Fresh in 2020, via an Assignment and Assumption of Management Agreement and Consent by Company dated

July 16, 2020 between FMP SA Management as Assignor and VitaNova as Assignee, with the consent of Fresh and Arizona Bank & Trust (the "2020 VitaNova Management Assignment"). Through this agreement, VitaNova took FMP SA Management's place as the manager under the 2015 Fresh-FMP SA Management Agreement.

113.    Second, VitaNova succeeded TXFMP as the manager of Buffets and its subsidiaries in 2021, via a Management Agreement dated January 1, 2021 between Buffets and VitaNova, for VitaNova to provide day-to-day management services to Buffets and its subsidiaries, for a weekly fee of 5% of Buffets' net consolidated revenues (the "2021 VitaNova Management Agreement").

## C.    Malfeasance and Mismanagement of the Debtors

114.    The Debtors were mismanaged for years by those in control of their operations, including the Owners, TXFMP, and VitaNova (through, inter alia, Cortes and Calvert).

115.    The Owners, TXFMP, and VitaNova caused the Debtors to pay excessive management fees to TXFMP and VitaNova — in other words, to themselves.

116.    For example, on information and belief (based on review of Debtor records and the record from the bankruptcy proceeding), from January 2020 to March 2021, Buffets, Fresh, and Tahoe Joe's paid a total of $7,654,906.71 in management fees, on aggregate revenues of $68,166,044; Buffets alone paid $5,087,053.21 in management fees on aggregate revenues of $360,016.17. These figures show that these Defendants caused the Debtors to pay exorbitant management fees that greatly exceeded the contractual rates.

117.    The Owners, TXFMP, and VitaNova caused the Debtors to overpay an estimated more than $6.9 million in purported management fees during the period of January 2020 to March 2021.

118.    Indeed, on information and belief (based on review of Debtor records, including documents produced by the Debtors' bankruptcy counsel), management fees were never invoiced,

and the amounts transferred for management fees were never supported by written calculations based on the formulas in the management agreements.

119.    Furthermore, on information and belief (based on review of Debtor records and the record from the bankruptcy proceeding), it appears that Buffets and Fresh continued to pay high management fees even after all restaurants (other than Tahoe Joe's) had been closed, leaving little (if any) need for management.

120.    On information and belief (based on review of Debtor records, and based on the Insiders' course of dealing and regular operations of the Debtors), these Defendants caused the Debtors to pay similarly excessive and non-contractual management fees before 2020, as well.

121.    The Debtors were structured so that there were specific Debtor entities responsible for paying payroll. However, on information and belief (based on review of Debtor records), these Defendants caused the Debtors to transfer to the "payroll entities" much more than was required (or actually paid) for payroll. For example, Fresh transferred $3.2 million to Alamo Fresh Payroll for a time period when Alamo Fresh Payroll only transferred to Paycor Inc. (which handled actually paying employees) $398,349.

122.    Similarly, the Debtors appear to have made payroll payments overwhelmingly in round numbers, which are inherently questionable.

123.    On information and belief, these Defendants also caused the Debtors to overpay Defendant Alamo Dynamic for food products.

124.    Alamo Dynamic operated a food production facility in Lubbock, Texas, that sold food products to the Debtors. In the year before the Petition Date, Alamo Dynamic received $804,405 from Fresh, $55,000 from Buffets, and $175,000 from Alamo Fresh Payroll — purportedly most or all for food products. In the year before that, Alamo Dynamic received $3.9 million from Fresh, $1.5 million from Buffets, and $95,000 from FMP SA Management.

125.    Nearly all of the transfers to Alamo Dynamic that make up those amounts were transfers of round, even figures — inherently questionable, and likely indicative that the amounts were not supported by actual food products received by the Debtors.

126.    These Defendants also caused the Debtors to incur exorbitant amounts of credit card charges. For example, in the year prior to the Petition Date, the Debtors incurred more than $8 million in credit card debt. Those excessive amounts are inherently questionable and, on information and belief (based on review of Debtor records, including credit card statements), included large amounts spent to personally benefit the Defendants — for example, for the personal medical expenses of the Owners — rather than to pay the Debtors' proper business expenses.

127.    These Defendants caused the Debtors to incur debts beyond their ability to pay.

128.    These Defendants drained the Debtors' profits for their own use (and the use of their other entities), while the Debtors' creditors went unpaid.

129.    These Defendants failed to cause the Debtors to file tax returns since 2015, leading to $150 million in claims filed by the Internal Revenue Service ("IRS") in this bankruptcy case, as well as large state liabilities, and otherwise causing harm to the Debtors.

130.    VitaNova's failure to perform its obligations as manager for the Debtors caused or contributed to the occurrence of massive unpaid vendor and tax liabilities for the Debtors, which the Trust has now inherited.

131.    Additionally, in managing the Debtors, VitaNova failed to keep separate, segregated records for them. For example, as discussed above, when VitaNova finally turned over Debtor files to the Trustee in mid-2022, as required under the Plan and Confirmation Order, it produced an enormous amount of data including millions of files belonging to the Debtors and various non-Debtor related entities. VitaNova was unable to extract from that morass the records specifically relating to the Debtors, because VitaNova had completely failed to properly maintain those records

so that they could be separately extracted.

132.    The foregoing are nonexclusive examples of the mismanagement suffered by the Debtors; they are not intended to be an all-encompassing list.

133.    Indeed, that mismanagement permeated the Defendants' interactions with and transactions involving the Debtors, many of which were improper or fraudulent, as further described below.

**D.    The Alamo Dynamic Property Transfer**

134.    The lack of respect for the corporate structure of the Debtors was also evidenced by systemic looting of their assets to benefit the Owners and their other entities.

135.    For example, Fresh previously owned certain real property in Lubbock County, Texas that was used, in part, for a food production facility (Lubbock County Assessor's Parcel Nos. R109610, R113676, R113595, R113622, R113648, R113817, R113842, and R319102) (the "Food Production Property").

136.    On or around August 10, 2015, the Food Production Property was transferred to Alamo Dynamic (the "Alamo Dynamic Transfer").

137.    On information and belief (based on review of Debtor records and the record from the bankruptcy proceeding), Fresh received no consideration for the Alamo Dynamic Transfer.

138.    On information and belief (based on review of Debtor records, the record from the bankruptcy proceeding, and public records), the Food Production Property had value at the time of the Alamo Dynamic Transfer.

139.    Specifically, although the Debtors' bankruptcy counsel contended during the bankruptcy proceeding that the Food Production Property was fully encumbered (and thus, they contended, had no value) when it was transferred, review of Debtor records revealed that the Food Production Property was not fully encumbered and, accordingly, had value, which belonged to Fresh.

140.    Because most of the information about the Alamo Dynamic Transfer was possessed by the Debtors and their Insiders, the transfer (and, in particular, its fraudulent nature) was not discovered (and reasonably could not have been discovered) by the Debtors' current creditors until this bankruptcy proceeding, beginning when the Trustee began asking questions on behalf of the Official Committee of Unsecured Creditors (the "Committee") and further when the Trustee gained access to the Debtors' records under the Plan.

141.    The poor state of the Debtors' records also contributed to the inability to discover the Alamo Dynamic Transfer.

142.    The Food Production Property was subsequently, on or about July 27, 2022, transferred first from Alamo Dynamic to Tropicale Foods, and then from Tropicale Foods to AGNL Scoop.

**E.    Other Real Property Transfers**

143.    The Defendants caused the Debtors to engage in other transfers of Debtor real property to Insiders and Affiliates that were not for reasonably equivalent value.

144.    For example, real property located at 204[4] Highway 28 Bypass, Anderson, South Carolina, Anderson County Tax Map No. 125-09-01-007-000 (the "Highway 28 Property"), was owned by Debtor Fire Mountain Restaurants in 2018.

145.    On or about December 7, 2018, the Highway 28 Property was transferred from Fire Mountain Restaurants to AB Real Estate, via a quitclaim deed reflecting payment of $1.00 (the "Highway 28 Property Transfer").

146.    AB Real Estate is an Insider and Affiliate of the Debtors. It is controlled and, on information and belief, owned by the Owners.

147.    On information and belief (based on review of the Debtors' records, the deed, and

property records), Fire Mountain Restaurants did not receive reasonably equivalent value for the Highway 28 Property Transfer.

148.    Indeed, as of the filing of this Verified Complaint, Anderson County, South Carolina property records reflect a market value of $722,300 for the Highway 28 Property.

149.    As another example, real property located at 1915 E. 29th Street, Marshfield, Wisconsin, Wood County Parcel No. 3305212A (the "29th Street Property"), was owned by Debtor OCB Restaurant in 2018.

150.    On or about December 7, 2018, the 29th Street Property was transferred from OCB Restaurant to AB Real Estate, via a quitclaim deed reflecting no consideration (the "29th Street Property Transfer").

151.    On information and belief (based on review of the Debtors' records, the deed, and property records), OCB Restaurant did not receive reasonably equivalent value for the 29th Street Property Transfer.

152.    Indeed, the 29th Street Property was subsequently sold by AB Real Estate to Counter-Form on or about February 25, 2020, for a purchase price of $925,000.00.

153.    The 29th Street Property was transferred to Counter-Form on or about February 25, 2020.

154.    Before the 29th Street Property Transfer occurred, the Owners, as managers and indirect members of OCB Restaurant, executed a Joint Action of the Members and Managers by Unanimous Written Consent, authorizing the 29th Street Property Transfer and deeming the transfer to be "in the best interests of [OCB Restaurant]."

155.    As another example, real property located at 1225 W. Reelfoot Avenue, Union City, Tennessee, Obion County Parcel No. 059 010.00 (the "Reelfoot Avenue Property"), was owned by

---

[4] Some records, including the quitclaim deed, incorrectly list the address number as 203.

Debtor Fire Mountain Restaurants in 2019.

156.    On information and belief (based on review of property records), on or about March 26, 2019, the Reelfoot Avenue Property was transferred from Fire Mountain Restaurants to AB Real Estate, for a purchase price of $520,00.00 (the "Reelfoot Avenue Property Transfer").

157.    On information and belief (based on review of the Debtors' records, the deed, and property records), Fire Mountain Restaurants did not receive reasonably equivalent value for the Reelfoot Avenue Property Transfer.

158.    Indeed, Obion County, Tennessee property records reflect a 2018 total market appraisal of $1,418,400.00 for the Reelfoot Avenue Property.

159.    On information and belief (based on review of property records), the Reelfoot Avenue Property was subsequently transferred to Q Lin Properties and then to UCT168.

160.    The Highway 28 Property Transfer, the 29th Street Property Transfer, the Reelfoot Avenue Property Transfer, and any other transfers of Debtor real property that were made for less than reasonably equivalent value are referred to herein as the "Other Real Property Transfers."

161.    Because most of the information about the Other Real Property Transfers (including, specifically, the Highway 28 Property Transfer, the 29th Street Property Transfer, the Reelfoot Avenue Property Transfer) was possessed by the Debtors and their Insiders, the transfers (and, in particular, their fraudulent nature) were not discovered (and reasonably could not have been discovered) by the Debtors' current creditors until this bankruptcy proceeding, when the Trustee gained access to the Debtors' records.

162.    Indeed, the Trustee did not discover those transfers until reviewing analyses by the Debtors' bankruptcy counsel that occurred during the bankruptcy proceeding.

163.    The poor state of the Debtors' records also contributed to the inability to discover these transfers until recently. Indeed, during the bankruptcy proceeding, Debtor employees were

unwilling or unable to provide supporting documentation for the Highway 28 Property Transfer, the

29th Street Property Transfer, or the Reelfoot Avenue Property Transfer.

**F.      Misuse of PPP Funds**

164.    The Debtors received various federal loans through the Paycheck Protection Program

("PPP"), a program implemented by the Small Business Administration ("SBA") that provided small

businesses with loans so they could maintain payroll during the COVID-19 pandemic, hire back

employees who had been laid off, and cover applicable overhead, including mortgages, rent, and

utilities.

165.    The Owners (directly and through All Jones, Dayspring, and Larrac), TXFMP, and

VitaNova caused the Debtors to misuse PPP funding that the Debtors received.

166.    Debtor Fresh received approximately $2,996,600 in PPP funds on April 17, 2020.

167.    Debtor Buffets received approximately $10 million in PPP funds on April 20, 2020.

168.    Notwithstanding receiving substantial PPP funding that was specifically designated

for items such as payroll and rent, the Debtors (through their managers and other control persons)

failed to direct most of their PPP funds to those permitted expenses.

169.    Instead, the PPP funding largely went to enrich Insiders and Affiliates, including the

Owners.

170.    For example, on April 20, 2020, $10 million in PPP funds (the "Buffets PPP Loan")

was deposited in an account ending in 2555, owned by Debtor Buffets (the "Buffets Account").

171.    That same day, the entire $10 million from the Buffets PPP Loan was immediately

transferred from the Buffets Account to an account ending in 6118, owned by Debtor Alamo Buffets

Payroll (the "Alamo Account"). The Alamo Account had held a balance of $0.00 before the entire

Buffets PPP Loan was transferred into it.

172.    The very next day, April 21, 2020, $4,050,000 — nearly half of the Buffets PPP Loan

— was transferred from the Alamo Account to an account ending in 2986, owned by Defendant <u>non-Debtor</u> TXFMP (the "TXFMP Account").

173.    From the TXFMP Account, the PPP funds were immediately drained by Insiders. On April 21, 2020, just one day after Buffets received its $10 million PPP loan, $1 million each was wired from the TXFMP Account to All Jones, Dayspring, and Larrac — all non-Debtors, and the personal entities of Jones, Kemp, and Harris/Rachel Harris.

174.    At an August 24, 2021 hearing, Calvert and Shapiro both acknowledged that $4,050,000 of the Buffets PPP Loan was transferred to non-Debtor TXFMP, testifying that it was "loan repayment." [Sale Hearing Tr., relevant excerpts attached as <u>Exhibit 2</u> hereto, at 53-54, 96].

175.    Loan repayment is not a permitted use of PPP funding.

176.    On information and belief (based on review of Debtor records), the nearly $3 million in PPP funding received by Debtor Fresh (the "Fresh PPP Loan") was similarly misappropriated by the Owners to be used for their personal benefit.

177.    For example, on information and belief (based, inter alia, on review of Debtor records, including bank statements), $1.85 million of the Fresh PPP Loan was ultimately transferred to non-Debtor River North Furr's, LLC ("River North") to settle a lawsuit brought by River North against the Owners and Padilla, as further described below. This was not a permitted use of PPP funding.

178.    Donbavand, the former Vice President - Real Estate & Business Development for the Debtors, testified in the deposition on March 5, 2021 that Jones "told me that they used [the PPP funds] to settle that fraud lawsuit with Steve Madlinger and the River North Group and said they were continuing to pay their very large salaries and other things," including remodeling stores. [<u>Exhibit 1</u>, at 112-13, 117].

179.    Furthermore, on April 17, 2020, the day the Fresh PPP Loan was received, $1 million

of those funds were transferred to the TXFMP Account, which transferred $300,000 to each of the Owners (as well as $100,000 to Padilla) that same day.

180.    On information and belief (based on review of Debtor records, including, inter alia, bank statements and email communications), the Owners, All Jones, Dayspring, Larrac, VitaNova, TXFMP, Cortes, and Calvert were all complicit in the PPP malfeasance.

181.    Indeed, Calvert later described himself as "the main person handling the cash including PPP funds, for the year." [Exhibit 3 hereto, at p. 3].

182.    Furthermore, based on review of the Debtors' records, it appears that Calvert signed at least portions of the PPP applications, including certifications.

183.    The Owners' misuse of the PPP program through the Debtors went beyond misappropriating the employee relief funding for the Owners' personal use.

184.    In mid-2020, the federal government gave companies the opportunity to apply for forgiveness of the COVID-19 relief loans, in whole or in part, if certain conditions had been met in the spending of the money.

185.    On information and belief (based on review of Debtor records), while the Debtors likely had some permissible costs and expenses to support forgiveness of their PPP loans, the spending was not correctly designated, and it appears that the forgiveness applications filed by the Debtors contained inaccuracies.

186.    On information and belief, on or about June 16, 2020, a Loan Forgiveness Application (the "Buffets Forgiveness Application") was filed with the SBA for the PPP funds received by Buffets, seeking forgiveness of the Buffets PPP Loan in its entirety.

187.    On information and belief (based on review of the Debtors' records, including email correspondence), Kemp, on behalf of Buffets, signed the Buffets Forgiveness Application.

188.    The terms of the Buffets PPP Loan allowed for forgiveness of the entire loan amount

so long as at least 60% of the funds received through the loan were spent on payroll-related costs.

189.    The Buffets Forgiveness Application represented that Buffets spent $6,363,536.34 on payroll costs, $6,393,765.48 on business rent or lease payments, and $2,147,729.90 on business utility payments.

190.    Based on those representations, the Buffets PPP Loan was forgiven in its entirety.

191.    On information and belief, as described herein, those representations in the Buffets Forgiveness Application may have been inaccurate and/or misleading.

192.    Buffets' records appear to reflect that it spent only $1,770,524.88 of the Buffets PPP Loan — less than 18% of the loan — on payroll costs.

193.    Indeed, on information and belief (based on review of the Debtors' records), Buffets spent at least $2,900,000.00 of the Buffets PPP Loan on credit card payments, at least $4,050,000.00 on management fees, and at least $468,882.87 on "Operating Funds."

194.    On information and belief, a similarly inaccurate and/or misleading forgiveness application was filed on behalf of Fresh.

195.    Fresh's records appear to reflect that it spent only $366,368.95 of the Fresh PPP Loan — less than 13% — on payroll costs.

196.    On information and belief (based on review of the Debtors' records), Fresh spent at least $99,000.00 of the Fresh PPP Loan on other loan payments, at least $100,000.00 on management fees, at least $242,000.00 on "Operating Funds," and at least $275,000.00 on credit card payments.

197.    On information and belief (based on review of the Debtors' records), Calvert, after being the "main person handling . . . PPP funds" throughout 2020, may have briefly left the companies around the time the forgiveness applications were filed.

198.    Cortes and Kemp were primarily responsible for the forgiveness application process/ filings, with (on information and belief, based on review of the Debtors' records, including emails)

the knowledge and involvement of the other Insider Defendants.

199.    On August 20, 2021, Calvert told the Debtors' bankruptcy counsel, Gray Reed, that
— based on his knowledge of how the PPP funds were spent — he was "not comfortable . . .
agreeing to the accuracy [of] any of the items on the PPP [forgiveness] application right now. I don't
feel the company paid enough of those [permitted] expenses and they are still sitting as liabilities on
the balance sheets." [Exhibit 3 hereto, p. 3].

200.    Calvert noted, for example, that specific taxes and payroll that were recorded as paid
on the forgiveness application were "still . . . unpaid" as of August 20, 2021. [*Id.* at p. 3].

**G.    The River North Settlement Payments**

201.    River North formerly was, with the Owners and Padilla, a member in Alamo Furr's,
LLC ("Alamo Furr's").

202.    In June 2019, River North sued FMP SA Management, the Owners, and Padilla in
U.S. District Court for the Western District of Texas, Case No. 5:19-cv-757, alleging that River
North was entitled to repayment of its capital contribution to Alamo Furr's and a preferred return
(the "River North Litigation").

203.    The River North Litigation was settled on or about May 13, 2020 with an agreement
that Alamo Furr's would redeem River North's 14% ownership interest for payment to River North
of $1.85 million.

204.    Notwithstanding the fact that non-Debtor Alamo Furr's was purportedly redeeming
River North's ownership interest, and notwithstanding the fact that the redemption would inure
primarily to the benefit of the Owners (whose respective ownership interests in Alamo Furr's would
be correspondingly increased with the redemption), the $1.85 million redemption was paid by Debtor
FMP SA Management — which gained nothing from the transaction.

205.    FMP SA Management, via TXFMP, made the following transfers to River North,

totaling $1.85 million: a transfer of $500,000 on May 15, 2020 and transfers of $112,500 each on June 1, 2020, July 1, 2020, July 31, 2020, September 1, 2020, October 1, 2020, October 30, 2020, December 1, 2020, January 4, 2021, February 1, 2021, March 1, 2021, April 1, 2021, and April 30, 2021 (collectively, the "River North Transfers").

206.    On information and belief (based, inter alia, on review of the Debtors' records, including bank statements), the primary or sole source of the funds for the River North Transfers was the Fresh PPP Loan.

207.    Again, Donbavand testified in March 2021 that Jones told him the Owners used PPP funds to settle the River North Litigation. [Exhibit 1, at 112-13, 117].

208.    The River North Transfers were made for the benefit of the Owners and Padilla (which directly benefitted from resolution of the claims against them and indirectly benefitted from the redemption of River North's interest), as well as Alamo Furr's (which directly benefitted from the redemption of River North's interest).

209.    Debtor FMP SA Management did not receive reasonably equivalent value for the River North Transfers.

210.    Indeed, Debtor FMP SA Management did not even receive the 14% interest in Alamo Furr's that Debtor FMP SA Management repurchased.

211.    The River North Transfers were concealed from creditors and the Court. They were not disclosed in the Schedules — indeed, even the bank account to which they were transferred was omitted from disclosure.

212.    On information and belief (based on their participation in preparing the Schedules), Cortes, Calvert, and VitaNova were involved in concealing the River North Transfers by omitting them from the Schedules.

213.    And, when the Debtors' counsel — prodded by the Committee — questioned

Ogletree (which represented the defendants to the River North Litigation) about the source of the funds for the River North Transfers, Kemp told Ogletree to not respond "while our Atty gets it squashed." [Email attached (sans attachments) as <u>Exhibit 4</u> hereto]. This was a further attempt to conceal the transfers from creditors and the Court.

214.    Additionally, on information and belief (based on review of the Debtors' bank records), one or more of the Debtors paid the fees for Ogletree's representation of the River North Litigation defendants. Those payments (the "Ogletree Transfers") were also made for the benefit of the Owners and Padilla, and the Debtors also did not receive reasonably equivalent value for the Ogletree Transfers.

215.    For example, FMP SA Management's bank statements reflect a November 6, 2020 $50,000 payment to Ogletree from an FMP SA Management credit card (ending in 6863) issued to Calvert. The Ogletree Transfers include, without limitation, all payments to Ogletree from that credit card for the River North Litigation fees.

216.    Information about and evidence of the Ogletree Transfers is primarily possessed/controlled by Ogletree. The Trustee will be able to identify the Ogletree Transfers with further specificity after discovery of that information.

217.    Although FMP SA Management was a defendant represented by Ogletree in the River North Litigation, that representation was primarily for the benefit of the Owners and Padilla, as described above. Accordingly, FMP SA Management should not have paid for those fees (or, at the very least, its portion of the fees should have been very small in comparison to those of the Owners and Padilla). Accordingly, FMP SA Management did not receive reasonably equivalent value for the Ogletree Transfers.

218.    The River North Transfers and the related Ogletree Transfers were yet another example of the Owners' looting the Debtors to pay for their own personal expenses.

### H.      Malfeasance and Continued Mismanagement During the Bankruptcy

219.    The actions by the Owners, entities they control (VitaNova, All Jones, Dayspring, and Larrac), and their accomplices (Cortes and Calvert) to undermine the Debtors and harm creditors and the Estate continued even during this bankruptcy proceeding.

220.    During the bankruptcy case, VitaNova (directed by the Owners) caused the Debtors' professionals to act in ways that did not benefit the Debtors, and instead benefitted the Insiders.

221.    Indeed, Joseph Pegnia of B. Riley Advisory Services ("B. Riley"), the Debtors' Chief Restructuring Officer, wrote in an October 7, 2021 email to Gray Reed (the Debtors' bankruptcy counsel): "I think it is wrong that we have continued to work this case for their [VitaNova's] benefit . . . ." [Exhibit 5 hereto, p. 1].

222.    From the beginning, the bankruptcy was structured to benefit the Owners and other Insiders. For example, VitaNova caused the Debtors to incur a debtor-in-possession line of credit (the "DIP") that was not in the Debtors' best interests. Instead, it benefitted Insiders and Affiliates: VitaNova and, through it, the Owners.

223.    Then, throughout the proceeding, VitaNova made unfounded threats to terminate the financing, to put undue pressure on the Debtors to act in a certain way.

224.    This bankruptcy was atypical, in that, instead of the Chief Restructuring Officer, B. Riley, handling day-to-day operations, financial management, accounting, and similar responsibilities for the Debtors during the proceeding, all such tasks were handed off to Insider VitaNova — and then VitaNova failed to perform the work.

225.    During the proceeding, VitaNova substantially failed to provide financial and other information, and provided inaccurate information on the occasions when it did provide information, resulting in inaccurate, deficient, and missing filings by the Debtors, and resulting in increased professional fees for the Debtors and the Committee.

226.     The Schedules and the few filed Monthly Operating Reports ("MORs") were — due to VitaNova's failure to provide accurate and complete information — riddled with inaccuracies and could not be relied upon by the Court or creditors.

227.     The Debtors used a software accounting package that, while commonly used in complex businesses, is a very specialized tool and requires specialized operating staff.

228.     Before or shortly after the Petition Date, VitaNova and/or the Owners terminated all employees who knew how to use this accounting software. This meant that, during the bankruptcy, the Committee (and, subsequently, the Trustee) had no way to read or understand the data from the software; VitaNova and the Owners failed to provide the Committee with the necessary information (or access to the former employees with the knowledge).

229.     During the bankruptcy case, VitaNova continued to receive management fees from the bankruptcy Estate until September 2021. Notably, the relevant management agreements were never subject to approval by the Court, and thus creditors were not given the opportunity to challenge them.

230.     Despite receiving those continuing fees, VitaNova substantially failed to perform management services for the Debtors during this time period. For example, without limitation, VitaNova failed to cause the Debtors to file tax returns, failed to provide the information necessary for MORs to be filed for the Debtors (as required by 28 C.F.R § 58.8) for most months of the bankruptcy, and provided the Debtors' professionals with inaccurate financial information that rendered financial filings for the Debtors (including the two months of MORs that were filed, one of which was late and did not cover all of the Debtors) unreliable and inaccurate.

231.     During the bankruptcy case, VitaNova caused or permitted the Debtors to be shut out of their offices, and caused or permitted the Debtors' data servers — including important Debtor financial information — to be transferred from a server owned by Debtor FMP SA Management to

the cloud, where it was beyond the control of the Debtors and the Estate. None of the Defendants —

neither the Owners, VitaNova, Cortes, nor Calvert — notified the Court or creditors about these

prejudicial changes to the Debtors' circumstances and property during the bankruptcy.

232.    Perhaps the most visible example of the Owners' attempts to (through VitaNova)

control the bankruptcy proceeding to benefit themselves (instead of the Estate and creditors) was

VitaNova's attempt to conduct a sham purchase of the Debtors' remaining lucrative assets.

233.    During the bankruptcy case, VitaNova advocated for, and caused the Debtors to

propose that, the Debtors' assets (including their only still-operating business, Tahoe Joe's) be sold

to VitaNova as the stalking horse bidder. That proposed transaction (the "Failed Sale") would have

provided for the repayment of the DIP to VitaNova but would have produced no cash to the Debtors

and would have caused a full release of millions of dollars of potential Debtor Causes of Action,

including without limitation those asserted herein.

234.    The Failed Sale was designed to benefit Insiders and Affiliates, particularly VitaNova.

The proposal was for VitaNova to purchase the Tahoe Joe's restaurants (the only still-operating

portion of the Debtors' business), all of the Debtors' intellectual property, and all Causes of Action

belonging to the Debtors (including those brought in this adversary proceeding) for a credit bid of

$3.5 million and the assumption of about $10.8 million in liabilities that were, in large part, wholly

unrelated to the on-going Tahoe Joe's business proposed to be transferred to VitaNova. Thus, the

total alleged purchase price was a market-chilling $14,358,000, despite the fact that the Failed Sale

would have produced no cash for the Estate.

235.    The circumstances around the Failed Sale highlighted the fact that VitaNova — and,

through it, the Owners — were continuing to pull the strings for the Debtors.

236.    Indeed, when the Trustee asked B. Riley whether the Debtors' Causes of Action had

been analyzed and valued for the proposed sale to VitaNova, Mark Shapiro of B. Riley told the

Trustee there was no need to spend the time because it was VitaNova's company and VitaNova would own everything anyway.

237.    Gray Reed, the Debtors' counsel in the bankruptcy proceeding, relied on VitaNova (as the Debtors' manager and as the proponent of the Failed Sale) to provide exhibits for an August 24, 2021 hearing on the Failed Sale. VitaNova provided what Gray Reed described as "PPP exhibits [that] are materially inaccurate such that they cannot be used," and management fee exhibits and intercompany loan exhibits that did "not appear to line up with the data that [the Debtors had] disclosed to the Court in the SOFAs." [Exhibit 6 hereto, p. 1].

238.    Then, as discussed above, Calvert told Gray Reed that he did not believe the PPP forgiveness application was accurate and that he was "not comfortable testifying that PPP money out was used/spent on forgivable expenses." [Exhibit 3, p. 2].

239.    VitaNova's failures to support the sale it had advocated for were critical. As Gray Reed described it: Calvert provided exhibits "very late," Cortes provided exhibits "so useless" that they could not be used, Calvert informed Gray Reed that the PPP information provided by Cortes was inaccurate, and "VitaNova/Larry [Harris]" refused to let Gray Reed seek a continuance for the hearing, which would have allowed more time to prepare. [Exhibit 7 hereto, p. 1].

240.    After considerable expense to the Debtors, the Estate, the Committee, and creditors, the Court ultimately denied the Failed Sale, in part because VitaNova — after creating and advocating for the proposal — failed and refused to support the proposal in the sale hearing.

I.      **The Challenged Transfers**

241.    During the 10 years before the Petition Date (the "Lookback Period"), one or more Debtors made fraudulent transfers of various property/assets to or for the benefit of various Defendants (many or all of which were Insiders or Affiliates of the Debtors), as initial or subsequent transferees. All such transfers are collectively referred to herein as the "Challenged Transfers."

242.    For example, the Challenged Transfers include all transfers from any Debtor to or for the benefit of any Affiliate of the Debtor, including without limitation all distributions, during the Lookback Period.

243.    The Challenged Transfers include all transfers from any Debtor to or for the benefit of any of the Owners, including without limitation all distributions, during the Lookback Period.

244.    The Challenged Transfers include all transfers from any Debtor to or for the benefit of VitaNova or TXFMP, for purported management fees, during the Lookback Period (again, it is estimated there were more than $6.9 million in <u>overpayments</u> of purported management fees during the period of January 2020 to March 2021 alone; likely, there were also overpayments in prior years). For payments beyond those required by the management contracts, no consideration was given.

245.    The Challenged Transfers also include all transfers from any Debtor to or for the benefit of VitaNova, for purported management fees, <u>after</u> the Petition Date. Again, VitaNova <u>did not provide</u> the management services for which those payments were allegedly made, and thus reasonably equivalent consideration was not provdied. These include, without limitation: $27,870.00 transferred in or about the week of May 28, 2021; $22,123.00 transferred in or about the week of June 4, 2021; $22,565.00 transferred in or about the week of June 18, 2021; $114,109.00 transferred in or about the week of June 25, 2021; $25,437.00 transferred in or about the week of July 2, 2021; $37,823.00 transferred in or about the week of July 9, 2021; $44,450.00 transferred in or about the week of July 23, 2021; $62,952.92 transferred in or about the week of August 20, 2021; and $59,211.00 transferred in or about the week of September 3, 2021 — a total of $416,540.93.

246.    The Challenged Transfers include all transfers of PPP funding to or for the benefit of any of the Owners.

247.    The Challenged Transfers include, <u>without limitation</u>, the following specific transfers:

a.   The Alamo Dynamic Transfer.

b.   The Other Real Property Transfers.

c.   The transfers of $1 million each to All Jones, Dayspring, and Larrac, from the TXFMP Account, on April 21, 2020 (the Buffets PPP funding), for which the Debtors' records reflect no consideration given (and which were for the benefit of Jones, Kemp, and Harris and Rachel Harris, respectively).

d.   The transfers of $300,000 each to Jones, Kemp, and Harris, from the TXFMP Account, on April 17, 2020 (the Fresh PPP funding), for which the Debtors' records reflect no consideration given.

e.   The Ogletree Transfers.

f.   Transfers to TXFMP of $66,000 from Food Management Partners, $265,000 from Fresh, $1,303,811 from Alamo Buffet Payroll, $1,520,000 from Tahoe Joe's, and $190,000 from Buffets.

g.   Transfers to VitaNova of $15,000 from Fresh and $470,000 from Tahoe Joe's.

h.   All transfers listed on Exhibit 8 hereto, which reflects transfers of the Debtors' assets to non-Debtor Affiliates within two years before the Petition Date that have been identified as of the filing of this Verified Complaint.[5] Those transfers total about $53.5 million, including, inter alia: $29.4 million to TXFMP, $6.6 million to Alamo Dynamic (two accounts), and more than $535,000 to VitaNova.

248.   The foregoing are merely examples of the Challenged Transfers. The Challenged Transfers encompass all fraudulent transfers from any Debtor to or for the benefit of any Defendant

---

[5] The Challenged Transactions are not limited to the two-year period preceding the Petition Date. This chart merely reflects, as exemplars, certain transfers that have been identified as of the filing of this Verified Complaint. The chart is not believed to be a complete listing of all transfers that took place in the period covered by the chart.

(either as an initial or subsequent transferee) that are within any applicable statute of limitations.

249.    Due to the Defendants' failures to keep accurate and sufficient records for the Debtors, as well as their failures to cause financial statements and other accounting documents to be prepared for the Debtors at relevant times, the Trustee has not been able to fully trace all transfers of the Debtors' assets during the relevant time period.

**J.      Claims and Principal Creditors in the Bankruptcy**

250.    More than 500 proofs of claim were filed against the Debtors in these consolidated bankruptcy proceedings, totaling more than $700 million in claims. The Trust has resolved objections to claims resulting in substantial reductions to those figures, and the Trustee anticipates that the number and amount of claims will be further reduced as additional objections are resolved. However, millions of dollars will remain, as a result of the failures by the Owners and their Affiliates to adequately manage the Debtors and pay the Debtors' liabilities.

251.    The proofs of claim in this case include claims filed by former employees for unpaid wages, claims filed by service providers and suppliers, claims filed by landlords for unpaid rents, and claims from taxing entities, including claims for unpaid trust fund taxes, among other things.

252.    For example, the IRS has filed 14 proofs of claim for $245,238,433.26 in unpaid taxes.

253.    Employees have filed claims that, as of the filing of the First Amended Complaint, exceed $1.3 million for unpaid wages and other employment-related claims.

254.    Landlords have filed claims estimated to exceed $24 million for unpaid rent.

**K.      The Debtors' Records and the Trustee's Review**

255.    The Trustee has possession of certain Debtor records, including: documents turned over by VitaNova pursuant to the Plan, documents turned over by Debtor professionals (such as B. Riley, Gray Reed, and Ogletree) pursuant to the Plan (including Gray Reed's analysis of legal causes

of action), and documents obtained by third-parties (such as Arizona Bank and Trust) pursuant to Rule 2004 requests — a universe of millions of documents. The Trustee has reviewed significant portions of those records.[6]

256.    The Trustee has reviewed public records related to the Debtors, including property records related to property owned or formerly owned by the Debtors.

257.    The Trustee has reviewed filings and materials from other lawsuits filed against Debtors or their Insiders.

258.    The Trustee has reviewed the record in the bankruptcy proceeding, including without limitation all filings and hearing transcripts (all of which are incorporated herein by reference).

259.    The Trustee has talked with certain Debtor Insiders and former Debtor employees.

260.    The Trustee's review of the foregoing documents and information formed a basis for the allegations in this lawsuit, including those alleged "on information and belief."

261.    Many of the events, actions, and omissions alleged herein were discovered as part of the Trustee's review of these materials during the bankruptcy proceeding or since the Effective Date of the Plan. Those reasonably could not have been discovered by creditors sooner because most relevant information was possessed/controlled by the Debtors and their Insiders, and because of the poor state of the Debtors' records. Additionally, the Debtors were dominated and controlled by the wrongdoers until at least the bankruptcy was filed, and, more likely, until the Effective Date of the Plan.

### CLAIM ONE

**Veil-Piercing/Alter Ego, and Declaratory Relief Re: Same — Against Jones, Kemp, Harris, Rachel Harris, TXFMP, VitaNova, Dayspring, All Jones, and Larrac**

262.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First

---

[6] As alleged above, documents turned over by VitaNova were not in a state permitting thorough or adequate review.

Amended Complaint as if fully set forth herein.

263.    The Owners, All Jones, Dayspring, Larrac, and, at certain times, TXFMP and VitaNova operated the Debtors (and their Affiliates) as alter egos.

264.    The Owners, All Jones, Dayspring, Larrac, TXFMP, and/or VitaNova used the Debtors (and their Affiliates) as sham entities to perpetrate injustice, fraud, and potential illegality, including, without limitation, the PPP misuse and the other acts and omissions alleged in this pleading.

265.    The Owners, All Jones, Dayspring, Larrac, TXFMP, and VitaNova, individually and collectively, exercised control over, and completely dominated, the Debtors (and their Affiliates).

266.    The Debtors (and their Affiliates) were undercapitalized.

267.    The Owners, All Jones, Dayspring, Larrac, TXFMP, and VitaNova failed to observe corporate formalities of the Debtors (and their Affiliates), including failing to keep separate corporate records for each company.

268.    The Owners, All Jones, Dayspring, Larrac, TXFMP, and VitaNova caused and/or permitted the Debtors (and their Affiliates) to continue to incur debts (including, without limitation, some of those that form the basis for claims in this bankruptcy case) while they were insolvent.

269.    The Owners, All Jones, Dayspring, Larrac, TXFMP, and/or VitaNova diverted assets of the Debtors (and their Affiliates) for personal use, or for use by their other companies.

270.    The Owners, All Jones, Dayspring, Larrac, TXFMP, and VitaNova used the Debtors (and their Affiliates) as mere façades for their operations.

271.    Defendants' use of the corporate structure as to the Debtors was illegitimate and involved bad faith, fraud, abuse, wrongdoing, and injustice by Defendants.

272.    The Owners, All Jones, Dayspring, Larrac, TXFMP, and VitaNova directly personally benefitted from their misuse of the Debtors (and their Affiliates).

273.    Piercing the veils of the Debtors (and, to the extent necessary to afford complete relief, their Affiliates) is necessary to avoid injustice or fundamental unfairness.

274.    Jones operated All Jones in the same or similar fashion as Defendants operated the Debtors, with respect to each allegation in this claim.

275.    Kemp operated Dayspring in the same or similar fashion as Defendants operated the Debtors, with respect to each allegation in this claim.

276.    Harris and Rachel Harris operated Larrac in the same or similar fashion as Defendants operated the Debtors, with respect to each allegation in this claim.

277.    The Owners operated TXFMP in the same or similar fashion as Defendants operated the Debtors, with respect to each allegation in this claim.

278.    The Owners operated VitaNova in the same or similar fashion as Defendants operated the Debtors, with respect to each allegation in this claim.

279.    The Owners, All Jones, Dayspring, Larrac, TXFMP, and VitaNova are the alter egos of the Debtors and their Affiliates; and the Debtors' (and, to the extent necessary to afford complete relief, their Affiliates') veils should be pierced to reach the Owners, All Jones, Dayspring, Larrac, TXFMP, and VitaNova.

280.    Dayspring is the alter ego of Kemp (and of the Debtors), and Dayspring's veil should be pierced to hold it liable, and should be reverse-pierced to hold Kemp liable.

281.    All Jones is the alter ego of Jones (and of the Debtors), and All Jones' veil should be pierced to hold it liable, and should be reverse-pierced to hold Jones liable.

282.    Larrac is the alter ego of Harris and Rachel Harris (and of the Debtors), and Larrac's veil should be pierced to hold it liable, and should be reverse-pierced to hold Harris and Rachel Harris liable.

283.    TXFMP is the alter ego of the Owners, and TXFMP's veil should be pierced to hold

the Owners liable for all claims against TXFMP asserted herein.

284.    VitaNova is the alter ego of the Owners, and VitaNova's veil should be pierced to hold the Owners liable for all claims against VitaNova asserted herein.

285.    A real and justiciable controversy exists between the Trust, on one hand, and The Owners, All Jones, Dayspring, Rachel Harris, Larrac, TXFMP, and VitaNova, on the other hand, as to those Defendants' obligation (through alter ego and/or veil-piercing) for the debts of the Debtors and the claims against the Debtors in this bankruptcy case.

286.    Pursuant to 11 U.S.C. §§ 541 and 544 and applicable state law, the Debtors' veils should be pierced and the Court should declare that Jones, Kemp, Harris, Rachel Harris, Dayspring, All Jones, Larrac, TXFMP, and VitaNova are, through alter ego liability and/or veil-piercing, liable for all of the Debtors' obligations and liabilities existing as of the Petition Date, including without limitation all claims filed in this bankruptcy proceeding, and should also declare that the Owners are liable for all of TXFMP's and VitaNova's obligations and liabilities on the claims brought herein.

## CLAIM TWO

**Breach of Fiduciary Duties — Against Jones, Kemp, Harris, Dayspring, All Jones, Larrac, Rachel Harris, Cortes, Calvert, TXFMP, and VitaNova**

287.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

288.    As direct or indirect members, managers, directors, and/or officers of one or more of the Debtors, the Owners, All Jones, Dayspring, Larrac, Rachel Harris, Cortes, Calvert, TXFMP, and VitaNova owed each of those Debtors fiduciary duties.

289.    Those fiduciary duties included duties of loyalty, care, good faith, and/or obedience.

290.    Defendants also owed fiduciary duties to creditors of the Debtors, once the Debtors entered the zone of insolvency and/or became insolvent.

291.    Defendants breached their fiduciary duties of loyalty, care, good faith and fair dealing, and/or obedience, including through the actions and inactions alleged herein.

292.    For example, without limitation, Defendants breached their fiduciary duties through:

a.    Engaging in actions and omissions that were not in the best interests of the Debtors, and that instead were in the interests of Defendants.

b.    Engaging in actions and omissions that were not in the best interests of the Debtors, after the Debtors entered the zone of insolvency.

c.    Failing to use the care that a reasonable person in their position would use.

d.    Authorizing, causing, receiving, and/or benefitting from transfers of the Debtors' assets (including many of the Challenged Transfers, as well as the River North Transfers) that were not for value and/or did not benefit the Debtors, but instead benefitted Defendants.

e.    Authorizing, causing, receiving, and/or benefitting from transfers of the Debtors' assets (including without limitation through distributions and purported management fees), while the Debtors were insolvent or in the zone of insolvency, that allowed Defendants to receive payments in preference to the Debtors' creditors.

f.    Causing the Debtors to enter management agreements that were not in their best interests.

g.    Causing the Debtors to pay purported management fees that were undue and exceeded the contractual amounts.

h.    Using the Debtors for improper and potentially fraudulent purposes, including, without limitation, misuse of PPP funds.

i.    Failing to apply PPP funds for their intended purposes of payroll and rent,

resulting in claims against the Debtors in this bankruptcy by unpaid employees and landlords.

j.      Failing to act in the best interests of the Estate and creditors during the bankruptcy proceeding.

k.      Permitting the acts and omissions alleged herein.

293.    Defendants' breaches of fiduciary duties were not in the best interests of the Debtors.

294.    Defendants' breaches of fiduciary duties were done in bad faith and were willful and wanton.

295.    Defendants acted with deliberate intent to injure the Debtors, or with reckless disregard for the Debtors' best interests.

296.    Defendants' breaches of fiduciary duties rendered the Debtors unable to meet their legal obligations.

297.    The Debtors and the Trust were injured by Defendants' breaches of fiduciary duties in an amount to be proven at trial.

**CLAIM THREE**

**Aiding and Abetting Breach of Fiduciary Duties, or Knowing Participation in Fiduciary Breach — Against Jones, Kemp, Harris, Dayspring, All Jones, Larrac, Rachel Harris, Cortes, Calvert, TXFMP, and VitaNova**

**(In the Alternative to Breach of Fiduciary Duties)**

298.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

299.    Alternatively, to the extent any of the Defendants subject to Claim Two, above, are found not to owe the relevant fiduciary duties, then, on information and belief (based on review of the Debtors' records and also based on each Defendant's involvement in the breaches, as described

above), such Defendants knowingly participated in, aided, and abetted the fiduciary breaches set forth in Claim Two, above.

300.    These Defendants knew of the fiduciary relationships alleged in Claim Two, above.

301.    These Defendants participated in actions that caused breaches of those relationships, and they did so knowingly, through the conduct alleged herein.

302.    The Debtors were injured by the fiduciary breaches, in which Defendants knowingly participated, in an amount to be proven at trial.

## CLAIM FOUR

**Fraudulent Transfers — Against Jones, Kemp, Harris, VitaNova, TXFMP, Dayspring, All Jones, Larrac, Rachel Harris, Alamo Furr's, Ogletree, Alamo Dynamic, Tropicale Foods, AGNL Scoop, AB Real Estate, Counter-Form, Q Lin Properties, UCT168**

303.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

304.    On information and belief (as alleged above, and based on, inter alia, review of the Debtors' records and public records), the Challenged Transfers were made without receiving reasonably equivalent value.

305.    The Debtors were insolvent at the time of the Challenged Transfers, or (in the alternative) the Challenged Transfers rendered the Debtors insolvent, or (in the alternative) the Debtors became insolvent shortly after the Challenged Transfers.

306.    At the time of the Challenged Transfers, the Debtors were engaged or about to be engaged in a business(es) or transaction(s) for which their remaining assets were unreasonably small in relation to the business(es) or transaction(s).

307.    At the time of the Challenged Transfers, the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they

became due.

308.    Many of the Challenged Transfers were made to or for the benefit of Insiders. On information and belief (based on review of the Debtors' records, and based on the Debtors' and their Insiders' course of dealing), some of those were made under employment contracts and not in the ordinary course of business.

309.    The Challenged Transfers were made with actual intent to hinder, delay, or defraud creditors of the Debtors, including without limitation those creditors that have filed claims in this bankruptcy case.

310.    Indeed, for example, many of the Challenged Transfers occurred when the Defendants knew of the claims of the creditors in this bankruptcy and knew that bankruptcy was likely or certain.

311.    Most of the Challenged Transfers were to Insiders.

312.    For certain of the Challenged Transfers, on information and belief, the Debtors retained possession or control of property after the transfer (or, because the Insiders operated their companies as one empire without respecting each entity's separate existence, the effect was as if the Debtors retained possession or control).

313.    Certain of the Challenged Transfers were concealed, or their true nature was concealed.

314.    Indeed, for example, most of the Challenged Transfers listed on Exhibit 8 hereto were not disclosed on the Debtors' Statements of Financial Affairs filed in this bankruptcy proceeding.

315.    Before certain or all of the Challenged Transfers, the Debtors had been sued or threatened with suit, including, without limitation, by some of the parties that have filed claims in this bankruptcy case.

316.    Certain of the Challenged Transfers were of substantially all of the assets of one or more Debtors.

317.    In relation to certain of the Challenged Transfers, the Debtors removed or concealed assets.

318.    Certain of the Challenged Transfers occurred shortly after the Debtors incurred a substantial debt(s).

319.    Transfers to Dayspring were made for the benefit of Kemp.

320.    Transfers to All Jones were made for the benefit of Jones.

321.    Transfers to Larrac were made for the benefit of Harris and Rachel Harris.

322.    For most or all of the Challenged Transfers, information and evidence about the transfers (including about their fraudulent nature) is primarily possessed/controlled by certain Defendants — specifically, the Owners and the other Insider Defendants.

323.    The Challenged Transfers constituted fraudulent transfers within the meaning of 11 U.S.C. §§ 544(a), 544(b), and 548, as well as applicable non-bankruptcy fraudulent transfer law, including without limitation the Uniform Fraudulent Transfer Act ("UFTA").

324.    Which state's governs as to the non-bankruptcy portion of this claim is likely Texas law as to all transfers occurring in Texas; as to transfers (particularly of real property) occurring in other states, that likely depends on a conflict of law analysis between those other states and Texas.

325.    The Trustee asserts the 10-year lookback period from 26 U.S.C. § 6502, based on the fact that the IRS has claims against the Estate that, as of this filing, have not been disallowed.

326.    The Challenged Transfers are avoidable under 11 U.S.C. §§ 544(a), 544(b), and 548, as well as applicable non-bankruptcy fraudulent transfer law, including without limitation the UFTA.

327.    All subsequent transfers involving all or part of the funds/property transferred in the Challenged Transfers were not for reasonably equivalent value and were not taken in good faith.

328.    All Defendants that received or benefitted from any portion of any of the Challenged Transfers, whether as an initial transferee from one or more Debtors or as any subsequent transferee,

are liable for the property or amounts they received or benefitted from. The Trust may recover that property (or the value thereof) or amount from each such Defendant, pursuant to 11 U.S.C. § 550(a).

329.    Based on information known to the Trustee as of this filing, Tropicale Foods, AGNL Scoop, Counter-Form, Q Lin Properties, and UCT168 are named in this claim only as subsequent transferees for (as applicable) the Alamo Dynamic Transfer, the 29th Street Property Transfer, and the Reelfoot Avenue Property Transfer.

## CLAIM FIVE

### Preferential Transfers — Against Jones, Kemp, Harris, TXFMP, VitaNova, Dayspring, All Jones, Larrac, and Ogletree

330.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

331.    Certain of the Challenged Transfers (including, without limitation, the PPP transfers): (a) were transferred to or for the benefit of Jones and/or All Jones, Kemp and/or Dayspring, Harris and/or Larrac, VitaNova, and TXFMP; and (b) were for or on account of antecedent debt owed by the Debtors before each transfer was made; and (c) were neither intended to be nor in fact were contemporaneous exchanges for new value; and (d) were not made in the ordinary course of business or according to ordinary business terms; and (e) were not in exchange for a subsequent provision of new value not secured by an otherwise securable security interest. Collectively, all such transfers that occurred within one year before the Petition Date are referred to herein as the "Insider Preferential Transfers."

332.    The Insider Preferential Transfers include, without limitation, the following:

    a.    The $4.05 million transfer of PPP funds from Buffets to TXFMP, purportedly for loan repayment.

    b.    The transfers of $1 million each to All Jones, Dayspring, and Larrac, from the

TXFMP Account, on April 21, 2020 (the PPP funding), to the extent contended to have been for payment of a debt.

c.     The transfers of $300,000 each to Jones, Kemp, and Harris, from the TXFMP Account, on April 17, 2020 (the Fresh PPP funding), to the extent contended to have been for payment of a debt.

d.     "Catchup" management fees paid to TXFMP, for antecedent debts allegedly incurred in prior years, including without limitation a total of $370,000 paid during the period from December 4, 2020 to February 4, 2021.

e.     "Catchup" management fees paid to VitaNova, for antecedent debts allegedly incurred in prior years, including without limitation a total of $470,000 paid during the period from January 20, 2021 to April 12, 2021.

f.     Purported management fees paid to TXFMP and VitaNova, during the year before the Petition Date, that exceeded the amounts due under the management agreements.

333.   Additionally, all of the Ogletree Transfers that occurred within 90 days before the Petition Date (collectively, the "Ogletree Preferential Transfers"): (a) were transferred to or for the benefit of Ogletree; and (b) were (or were claimed to be) for or on account of antecedent debt owed by the Debtors before each transfer was made.

334.   Jones, All Jones, Kemp, Dayspring, Harris, Larrac, VitaNova, and TXFMP were Insiders of the Debtors.

335.   The Insider Preferential Transfers and the Ogletree Preferential Transfers were made while the Debtors were insolvent.

336.   The Insider Preferential Transfers and the Ogletree Preferential Transfers enabled Defendants to receive more than they would have received as creditors if (a) this bankruptcy case

was a case under Chapter 7 of the Bankruptcy Code, (b) the transfers as issue had not been made, and (c) Defendants had received payment of their debts to the extent provided by the provisions of the Bankruptcy Code.

337. The Insider Preferential Transfers and the Ogletree Preferential Transfers constitute preferential transfers and are avoidable under 11 U.S.C. § 547. All Defendants that received any portion of such Insider Preferential Transfers and Ogletree Preferential Transfers are liable for those amounts. The Trust may recover that property (or the value thereof) or amount from each such Defendant, pursuant to 11 U.S.C. § 550(a).

## **CLAIM SIX**

**Conspiracy to Commit Fraudulent Transfers — Against Jones, Kemp, Harris, VitaNova, TXFMP, Dayspring, All Jones, Larrac, Cortes, Calvert, Alamo Dynamic, and AB Real Estate**

338. Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

339. The Owners, Dayspring, All Jones, Larrac, VitaNova, TXFMP, Cortes, Calvert, Alamo Dynamic, and AB Real Estate reached agreement(s) and had meeting(s) of the minds about accomplishing one or more of the Challenged Transfers, as well as the River North Transfers. This is evidenced by, inter alia, the Defendants' joint participation in causing those transfers. The timing of transfers (with multiple often occurring at once, and occurring, e.g., right after receipt of PPP funds) further indicates agreements and meetings of the minds, as does the overall scheme of fraud and fraudulent transfers.

340. These Defendants caused and/or participated in fraudulent transfers, as alleged above.

341. These Defendants also caused and/or participated in the River North Transfers, which constituted fraudulent transfers within the meaning of 11 U.S.C. §§ 544(a), 544(b), and 548, as well as applicable non-bankruptcy fraudulent transfer law, including without limitation the UFTA. The

Defendants reached an agreement and had a meeting of the minds as to those transfers, as evidenced by, inter alia, the timing of those transfers in comparison to this bankruptcy proceeding, and the effort to conceal those transfers, as well as the overall scheme of fraud and fraudulent transfers.

342.     The Debtors, the creditors of the Estate, and the Trust were damaged as a result.

343.     Defendants are liable, in an amount to be proven at trial, for conspiracy to commit the fraudulent transfers alleged herein.

## CLAIM SEVEN

### Fraudulently Incurred Obligations — Against VitaNova and TXFMP

344.     Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

345.     Buffets' obligations under the 2017 TXFMP Management Agreement and the 2021 VitaNova Management Agreement were incurred without receiving reasonably equivalent value.

346.     Buffets was insolvent at the time that these obligations were incurred, or these obligations rendered Buffets insolvent, or Buffets became insolvent shortly after the obligations were incurred.

347.     At the time that these obligations were incurred, Buffets was engaged or about to be engaged in a business(es) or transaction(s) for which its remaining assets were unreasonably small in relation to the business(es) or transaction(s).

348.     At the time that these obligations were incurred, Buffets intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as it became due.

349.     These obligations were incurred with actual intent to hinder, delay or defraud creditors of Buffets, including without limitation those creditors that have filed claims in this bankruptcy case.

Verif. First. Am. Compl.                    57

350. These obligations were incurred to Insiders.

351. Before these obligations were incurred, on information and belief, Buffets had been sued or threatened with suit, including, without limitation, by some of the parties that have filed claims in this bankruptcy case.

352. On information and belief, these obligations were incurred shortly after the Debtors incurred a substantial debt(s).

353. Buffets' obligations under the 2017 TXFMP Management Agreement and the 2021 VitaNova Management Agreement constitute fraudulent incurred obligations within the meaning of 11 U.S.C. §§ 544(a), 544(b), and 548, as well as applicable non-bankruptcy fraudulent transfer law, including without limitation the UFTA.

354. Buffets' obligations under the 2017 TXFMP Management Agreement and the 2021 VitaNova Management Agreement are avoidable under 11 U.S.C. §§ 544(a), 544(b), and 548, as well as applicable non-bankruptcy fraudulent transfer law, including without limitation the UFTA, and should be so avoided.

355. TXFMP and VitaNova are liable for the amounts they received purportedly under the 2017 TXFMP Management Agreement and the 2021 VitaNova Management Agreement, to the extent necessary to satisfy the allowed claims in this bankruptcy case.

## <u>CLAIM EIGHT</u>

### **Breach of Contract — Against VitaNova**

356. Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

357. The 2015 Fresh-FMP SA Management Agreement, as assigned via the 2020 VitaNova Management Assignment, was a contract between Fresh and VitaNova.

358. The 2021 VitaNova Management Agreement was a contract between VitaNova and

Buffets, with Buffets' subsidiaries as third-party beneficiaries.

359.    Fresh performed all its obligations and met all conditions precedent under the 2015 Fresh-FMP SA Management Agreement, as assigned via the 2020 VitaNova Management Assignment, or, to the extent it did not, any such obligations or conditions were excused.

360.    Buffets performed all its obligations and met all conditions precedent under the 2021 VitaNova Management Agreement or, to the extent it did not, any such obligations or conditions were excused.

361.    VitaNova breached these contracts, including through the actions and omissions alleged herein.

362.    VitaNova breached these contracts by, inter alia, mismanaging the Debtors and engaging in actions and omissions that were not in their best interests. This includes, without limitation, VitaNova's failure to adequately manage the Debtors during the bankruptcy proceeding.

363.    VitaNova breached these contracts by, inter alia, causing and receiving purported management fees that were excessive and not contractually based.

364.    VitaNova breached these contracts by, inter alia, not keeping separate or sufficient records and accounting for the Debtors.

365.    VitaNova breached these contracts by, inter alia, failing to cause the Debtors to file tax returns.

366.    VitaNova breached these contracts by, inter alia, engaging in actions and omissions with respect to the management of the Debtors that were not in the Debtors' (or their creditors') best interests and instead were in the interests of VitaNova.

367.    VitaNova breached these contracts by, inter alia, engaging in, and advocating for, and then failing to adequately support the Failed Sale, which was not in the Debtors' (or their creditors') best interests and instead was in the interests of VitaNova.

368.     VitaNova breached these contracts by, inter alia, failing to promptly, adequately, or completely surrender the Debtors' books and records after termination of the contracts.

369.     Those breaches damaged the Debtors in an amount to be proven at trial.

## CLAIM NINE

### Breach of Covenant of Good Faith and Fair Dealing — Against VitaNova

370.     Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

371.     The 2015 Fresh-FMP SA Management Agreement, as assigned via the 2020 VitaNova Management Assignment, was a contract between Fresh and VitaNova.

372.     The 2021 VitaNova Management Agreement was a contract between VitaNova and Buffets, with Buffets' subsidiaries as third-party beneficiaries.

373.     Implied in every contract is a duty to act fairly and in good faith.

374.     VitaNova breached the covenant of good faith and fair dealing implied in the 2015 Fresh-FMP SA Management Agreement, as assigned via the 2020 VitaNova Management Assignment, and in the 2021 VitaNova Management Agreement, including through the actions and omissions alleged herein.

375.     Those breaches damaged the Debtors in an amount to be proven at trial.

## CLAIM TEN

### Breach of Contract — Against TXFMP

376.     Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

377.     The 2017 TXFMP Management Agreement was a contract between TXFMP and Buffets, with Buffets' subsidiaries as third-party beneficiaries.

378.     Buffets performed all its obligations and met all conditions precedent under the 2017

TXFMP Management Agreement or, to the extent it did not, any such obligations or conditions were excused.

379.    TXFMP breached the 2017 TXFMP Management Agreement, including through the actions and omissions alleged herein.

380.    TXFMP breached the 2017 TXFMP Management Agreement by, inter alia, mismanaging the Debtors and engaging in actions and omissions that were not in their best interests.

381.    TXFMP breached the 2017 TXFMP Management Agreement by, inter alia, causing and receiving purported management fees that were excessive and not contractually based.

382.    TXFMP breached the 2017 TXFMP Management Agreement by, inter alia, not keeping separate or sufficient records or accounting for the Debtors.

383.    TXFMP breached the 2017 TXFMP Management Agreement by, inter alia, failing to cause the Debtors to file tax returns.

384.    TXFMP breached the 2017 TXFMP Management Agreement by, inter alia, engaging in actions and omissions with respect to the management of the Debtors that were not in the Debtors' (or their creditors') best interests and instead were in the interests of VitaNova.

385.    TXFMP breached the 2017 TXFMP Management Agreement by, inter alia, failing to apply PPP funds for their intended purposes of payroll and rent, resulting in claims against the Debtors in this bankruptcy by unpaid employees and landlords.

386.    Those breaches damaged the Debtors in an amount to be proven at trial.

## **CLAIM ELEVEN**

### **Breach of Covenant of Good Faith and Fair Dealing — Against TXFMP**

387.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

388.    The 2017 TXFMP Management Agreement was a contract between TXFMP and

Buffets, with Buffets' subsidiaries as third-party beneficiaries.

389.    Implied in every contract is a duty to act fairly and in good faith.

390.    TXFMP breached the covenant of good faith and fair dealing implied in the 2017

TXFMP Management Agreement, including through the actions and omissions alleged herein.

391.    The breach of the covenant of good faith and fair dealing implied in the 2017 TXFMP

Management Agreement damaged the Debtors in an amount to be proven at trial.

## CLAIM TWELVE

**Tortious Interference with Contract — Against Jones, Kemp, Harris, Dayspring, All Jones,**

**Larrac, Cortes, and Calvert**

392.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First

Amended Complaint as if fully set forth herein.

393.    The 2017 TXFMP Management Agreement was a contract between TXFMP and

Buffets, with Buffets' subsidiaries as third-party beneficiaries.

394.    The 2015 Fresh-FMP SA Management Agreement, as assigned via the 2020

VitaNova Management Assignment, was a contract between Fresh and VitaNova.

395.    The 2021 VitaNova Management Agreement was a contract between VitaNova and

Buffets, with Buffets' subsidiaries as third-party beneficiaries.

396.    The Owners, All Jones, Dayspring, Larrac, Cortes, and Calvert willfully and

intentionally inferred with the 2017 TXFMP Management Agreement, the 2015 Fresh-FMP SA

Management Agreement, and the 2021 VitaNova Management Agreement, including by causing the

breaches of those contracts alleged above.

397.    That interference proximately caused damages, including the damages caused by the

breaches of those contracts alleged above.

398.    The Owners, All Jones, Dayspring, Larrac, Cortes, and Calvert acted solely in their

own interests with respect to the contractual interference.

399.     The Debtors were actually damaged in an amount to be proven at trial.

## CLAIM THIRTEEN

### Breach of Contract — Against Alamo Dynamic

400.     Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

401.     Alamo Dynamic and Buffets entered an agreement for Buffets to loan $55,000 to Alamo Dynamic (the "Alamo Dynamic Loan").

402.     Buffets transferred $55,000 to Alamo Dynamic on or about January 27, 2021, pursuant to the Alamo Dynamic Loan.

403.     On information and belief (based on review of the Debtors' records), Alamo Dynamic has not repaid the Alamo Dynamic Loan, in breach of the contract.

404.     That breach has damaged the Debtors in an amount to be proven at trial, but no less than all amounts outstanding under the Alamo Dynamic Loan.

## CLAIM FOURTEEN

### Unjust Enrichment and/or Money Had and Received — Against TXFMP and VitaNova

405.     Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

406.     TXFMP and VitaNova received benefits from the Debtors, including the payment of purported management fees.

407.     Those benefits were received as a result of fraud, duress, or the taking of an undue advantage. For example, the overpayments were a result of fraud or the taking of an undue advantage, and all payments to TXFMP and VitaNova generally were the result of the taking of an undue advantage.

Verif. First. Am. Compl.                    63

408.    TXFMP and VitaNova are liable for unjust enrichment and/or money had and received, in amounts to be proven at trial.

## CLAIM FIFTEEN

### Conversion — Against TXFMP and VitaNova

409.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

410.    TXFMP and VitaNova have exercised dominion and control over property belonging to the Debtors, including without limitation purported management fees received by TXFMP and VitaNova.

411.    The Debtors had ownership of that property and the right to possess that property.

412.    The Debtors have made demand for the return of the property, or, in the alternative, demand would be futile, and TXFMP's and VitaNova's actions manifest a clear repudiation of the Debtors' rights to the property.

413.    TXFMP and VitaNova are liable for conversion of that property, in amounts to be proven at trial.

## CLAIM SIXTEEN

### Unjust Enrichment and/or Money Had and Received — Against Alamo Dynamic

414.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

415.    Alamo Dynamic received a benefit from Buffets in the form of the Alamo Dynamic Loan.

416.    That benefit was received as a result of fraud, duress, or the taking of an undue advantage.

417.    Alamo Dynamic is liable for unjust enrichment and/or money had and received, in

amounts to be proven at trial.

## CLAIM SEVENTEEN

### Conversion — Against Alamo Dynamic

418.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

419.    Alamo Dynamic has exercised dominion and control over property belonging to the Debtors, specifically, the $55,000 for the Alamo Dynamic Loan.

420.    The Debtors had ownership of that property and the right to possess that property.

421.    The Debtors have made demand for the return of the property, or, in the alternative, demand would be futile, and Alamo Dynamic's actions manifest a clear repudiation of the Debtors' rights to the property.

422.    Alamo Dynamic is liable for conversion of that $55,000 in property.

## CLAIM EIGHTEEN

### Unjust Enrichment and/or Money Had and Received — Against Jones, Kemp, Harris, Dayspring, All Jones, and Larrac

423.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

424.    The Owners, Dayspring, All Jones, and Larrac received benefits from the Debtors, including, without limitation, through improper distributions, misused PPP funds, Debtor funds spent for personal Defendant expenses/purposes, car allowances, use of Debtor credit cards for personal purposes (including personal medical expenses) that did not benefit the Debtors, and other transfers of Debtors funds (directly or indirectly) to these Defendants.

425.    Those benefits were received as a result of fraud, duress, or the taking of an undue advantage, or a combination thereof. Specifically, the Defendants exerted control over the Debtors

and thus took an undue advantage, and, as alleged above, fraud was involved in many of the transfers of the Debtors' assets to these Defendants.

426. Defendants are liable for unjust enrichment and/or money had and received, in amounts to be proven at trial.

## CLAIM NINETEEN

### Conversion — Against Jones, Kemp, Harris, Dayspring, All Jones, and Larrac

427. Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

428. The Owners, Dayspring, All Jones, and Larrac exercised dominion and control over property belonging to the Debtors, including, without limitation, through improper distributions, misused PPP funds, Debtor funds spent for personal Defendant expenses/purposes, car allowances, and use of Debtor credit cards for personal purposes (including personal medical expenses) that did not benefit the Debtors.

429. The Debtors had ownership of that property and the right to possess that property.

430. The Debtors have made demand for the return of the property, or, in the alternative, demand would be futile, and Defendants' actions manifest a clear repudiation of the Debtors' rights to the property.

431. Defendants are liable for conversion of that property, in amounts to be proven at trial.

## CLAIM TWENTY

### Unjust Enrichment and/or Money Had and Received — Against Alamo Furr's

432. Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

433. Alamo Furr's received a benefit from the Debtors, specifically, the redemption of River North's 14% ownership interest in Alamo Furr's, which was redeemed by payment of $1.85

million by Debtor FMP SA Management.

434.    That benefit was received as a result of fraud, duress, or the taking of an undue advantage.

435.    Alamo Furr's is liable for unjust enrichment and/or money had and received in the amount of the $1.85 million benefit conferred by FMP SA Management.

## CLAIM TWENTY-ONE

### Conversion — Against Alamo Furr's

436.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

437.    Alamo Furr's has exercised dominion and control over property belonging to the Debtors, specifically, the 14% ownership interest in Alamo Furr's that previously belonged to River North and that was redeemed by payment of $1.85 million by Debtor FMP SA Management.

438.    FMP SA Management, by making the redemption payment, had ownership of that 14% ownership interest in Alamo Furr's and the right to possess that property.

439.    The Debtors have made demand for the return of the property, or, in the alternative, Alamo Furr's actions manifest a clear repudiation of the Debtors' rights to the property.

440.    Alamo Furr's is liable for conversion of that property, and FMP SA Management is entitled to either return of the 14% ownership interest or a judgment in the amount of the $1.85 million payment.

## CLAIM TWENTY-TWO

### Trust Fund Doctrine — Against Jones, Kemp, Harris, TXFMP, VitaNova, Dayspring, All Jones, and Larrac

441.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

442.    When Defendants received many or all of the Challenged Transfers, the Debtors were insolvent or in the zone of insolvency.

443.    Due to the Debtors' insolvency and/or zone of insolvency, their assets became a trust fund for the benefit of their creditors, and Defendants owed duties to those creditors, to preserve the Debtors' assets for the benefit of creditors.

444.    Defendants violated the trust fund doctrine by causing the Debtors' insolvency and/or by causing and/or receiving the Challenged Transfers and the River North Transfers during the pendency of that insolvency, and Defendants are accordingly liable under the trust fund doctrine in the amount of all such transfers.

## CLAIM TWENTY-THREE

**Violations of RICO, 18 U.S.C. § 1961 *et seq.* — Against Jones, Kemp, Harris, TXFMP,**

**VitaNova, Cortes, and Calvert**

445.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

446.    The federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, provides a civil right of action based on certain concerted criminal activities.

447.    Defendants engaged in two or more "predicate acts" under RICO, including wire fraud (under 18 U.S.C. § 1343), bank fraud (under 18 U.S.C. § 1344), and loan application fraud (under 18 U.S.C. § 1014), through, inter alia, electronically submitting the inaccurate or misleading PPP loan and forgiveness applications, engaging in the improper transfers and improper use of the PPP loan funds, engaging in the other fraudulent Challenged Transfers, and engaging in the fraudulent River North Transfers.

448.    In engaging in those acts, Defendants acted with intent to deceive or defraud the federal government, and with intent to defraud the Debtors, their employees, and their creditors.

449.     Defendants engaged in this pattern of racketeering activity in connection with their conduct and control of various business enterprises, including, without limitation: (a) the overall business enterprise consisting of the Debtors and their Affiliates, (b) individual enterprises (entities) within that empire, (c) association-in fact enterprises among the Defendants, and (d) association-in-fact enterprises between the individual Defendants and their respective entities/holding companies.

450.     Defendants violated 18 U.S.C. § 1962(a) by, inter alia, using the PPP funds in the operation of various of their enterprises instead of properly using the PPP funds for the benefit of the Debtors and their employees, and using the Challenged Transfers and the River North Transfers of the Debtors' funds in the operation of various of their enterprises.

451.     Defendants violated 18 U.S.C. § 1962(c) by, inter alia, participating in the conduct of their enterprises through the inaccurate or misleading PPP loan and forgiveness applications, through the improper transfers and use of the PPP loan funds, and through the other fraudulent Challenged Transfers and the River North Transfers.

452.     Defendants violated 18 U.S.C. § 1962(d) by conspiring to commit the foregoing acts, and by knowingly agreeing to the acts and the objectives thereof.

453.     Defendants' actions demonstrated continuity because there was a period of repeated conduct, consisting of several years before the Petition Date, in which they caused and participated in the fraudulent Challenged Transfers and the River North Transfers, used the Challenged Transfers and River North Transfers of funds belonging to the Debtors for their own benefit or their enterprises' benefit instead of for the Debtors' benefit, used the PPP funds for distributions and other improper uses, failed to use the PPP funds for the uses that they were intended for (such as paying employees and landlords), and inaccurately or misleadingly filled out PPP loan forgiveness applications.

454.     Defendants' actions also pose a threat of continued criminal activity, including,

without limitation, continued misuse of the PPP funds that were improperly transferred to them.

455.    The Debtors and the Estate were damaged by this conduct, in an amount to be proven at trial.

456.    Inter alia, the Debtors and the Estate were damaged by this conduct through and in the amounts of the Challenged Transfers.

457.    Inter alia, the Debtors and the Estate were damaged by this conduct through and in the amount of all improperly used PPP funds, because those funds: (a) should have been spent for proper Debtor expenses but were not and (b) resulted in claims against the Debtors by parties who properly should have received the funds.

458.    Inter alia, the Debtors and the Estate were damaged by this conduct through and in the amount of all Department of Justice claims against the Estate as the result of the improper use of PPP funds.

## CLAIM TWENTY-FOUR

**Imposition of Constructive Trust — Against Jones, Kemp, Harris, Dayspring, All Jones, Larrac, Rachel Harris, TXFMP, VitaNova, Cortes, and Calvert**

459.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

460.    As alleged above, the Owners, Dayspring, All Jones, Larrac, Rachel Harris, TXFMP, VitaNova, Cortes, and Calvert all breached fiduciary duties and/or committed fraud with respect to the Debtors.

461.    Defendants were unjustly enriched through transfers of the Debtors' assets that they each received.

462.    Those transfers of assets form an identifiable res in the possession of each Defendant.

463.    The Court should impose a constructive trust on all assets of each Defendant that can

be traced to the Debtors' assets, as well as on any funds that Defendants subsequently transferred to

others.

## CLAIM TWENTY-FIVE

### Disallowance of Proof of Claim — Against Alamo Dynamic, TXFMP, All Jones, Dayspring,

### Larrac, and Ogletree

464.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First

Amended Complaint as if fully set forth herein.

465.    Alamo Dynamic has a scheduled claim, Claim s2282, against the bankruptcy estate.

466.    TXFMP has scheduled claims, Claim s2622 and Claim s2627, against the bankruptcy

estate.

467.    All Jones has a scheduled claim, Claim s2672, against the bankruptcy estate.

468.    Dayspring has a scheduled claim, Claim s2673, against the bankruptcy estate.

469.    Larrac has a scheduled claim, Claim s2674, against the bankruptcy estate.

470.    Claims s2282, s2622, s2627, s2672, s2673, and s2674 are referred to herein as the

"Insider Claims."

471.    Ogletree has scheduled claims, Claim s2363 and Claim s1997 (together, the "Ogletree

Claims"), against the bankruptcy estate.

472.    The Insider Claims and Ogletree Claims should be disallowed, pursuant to 11 U.S.C.

§ 502(b), because the claimants are liable to the Estate, on the legal claims set forth herein, in

amounts that equal or exceed their filed claims.

473.    The Insider Claims and Ogletree Claims should be disallowed, pursuant to 11 U.S.C.

§ 502(b), because the claims are unenforceable based on the legal claims, and for the reasons, alleged

herein.

474.    The Insider Claims and Ogletree Claims should be disallowed, pursuant to 11 U.S.C.

§ 502(d), because and to the extent that the claimants are transferees (or subsequent transferees) of transfers avoidable under 11 U.S.C. §§ 544 and 548.

## CLAIM TWENTY-SIX

**Setoff — Against Alamo Dynamic, TXFMP, All Jones, Dayspring, Larrac, and Ogletree**

**(In the Alternative to Disallowance of Proof of Claim)**

475.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

476.    Plaintiff has asserted, herein, legal claims for damages/monetary awards against Alamo Dynamic, TXFMP, All Jones, Dayspring, Larrac, and Ogletree.

477.    To any extent that the Ogltree Claims or the Insider Claims of any of those Defendants are held to be valid, Defendants' liability in this adversary action should be set off against the claims.

## CLAIM TWENTY-SEVEN

**Equitable Subordination — Against Alamo Dynamic, TXFMP, All Jones, Dayspring, and Larrac**

**(In the Alternative to Disallowance of Proof of Claim)**

478.    Plaintiff incorporates by this reference the preceding paragraphs of this Verified First Amended Complaint as if fully set forth herein.

479.    Alamo Dynamic, TXFMP, All Jones, Dayspring, and Larrac are all Insiders of the Debtors.

480.    These Defendants engaged in inequitable conduct as to the Debtors, including the acts and omissions alleged herein, and including, without limitation, fraud, mismanagement, breaches of fiduciary duties, fraudulent transfers, fraudulently incurred obligations, and use of the Debtors as alter egos or mere instrumentalities. The Insider Claims arose from that inequitable conduct.

481.   In the alternative, each of these Defendants was controlled by, and was an alter ego of, Kemp, Jones, and Harris, who engaged in such inequitable conduct, and that conduct should be imputed to each of these Defendants.

482.   The inequitable conduct injured the Debtors and creditors of the Estate.

483.   The inequitable conduct conferred an unfair advantage on these Defendants.

484.   The Insider Claims asserted by these Defendants are, most or all, for obligations that were allegedly created while the Debtors were undercapitalized.

485.   Equitable subordination of the Insider Claims would not be inconsistent with the provisions of the Bankruptcy Code.

486.   The Insider Claims should be subordinated in payment to all other claims against the Estate, pursuant to 11 U.S.C. § 510(c)(1).

## JURY DEMAND

The Trustee demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, the Trustee respectfully requests that judgment be entered in favor of the Trust and against Defendants, as follows:

A.   Awarding compensatory damages to the Trust and against Defendants, in amounts to be proven at trial;

B.   Declaring that Defendants Jones, Kemp, Harris, TXFMP, VitaNova, Dayspring, All Jones, and Larrac are the alter egos of the Debtors, and that the Debtors' corporate veils are pierced to reach Defendants Jones, Kemp, Harris, and VitaNova (and that All Jones' corporate veil is pierced to reach Jones, Dayspring's corporate veil is pierced to reach Kemp, and Larrac's corporate veil is pierced to reach Harris/Rachel Harris), and entering a monetary judgment against Defendants Jones, Kemp, Harris, Rachel

Harris, TXFMP, VitaNova, Dayspring, All Jones, and Larrac in the amount of all allowed claims against the Estate and administrative expenses in this bankruptcy case, or such other amounts as they are proven at trial to be liable for through veil-piercing;

C.     Declaring that Jones, Kemp, and Harris are the alter egos of TXFMP and VitaNova, and that TXFMP's and VitaNova's corporate veils are pierced to reach Jones, Kemp, and Harris, and entering a monetary judgment against Jones, Kemp, and Harris in the amount of all obligations and liabilities of TXFMP and VitaNova on the claims brought herein, or such other amounts as they are proven at trial to be liable for through veil-piercing;

D.     Avoiding the Challenged Transfers, and entering monetary judgments (or ordering the return of the transferred property) against all initial and subsequent transferees, pursuant to pursuant to 11 U.S.C. §§ 544(a), 544(b), 550(a), and 548;

E.     Avoiding the Insider Preferential Transfers and the Ogletree Preferential Transfers, and entering monetary judgments (or ordering the return of the transferred property) against all transferees, pursuant to 11 U.S.C. §§ 547 and 550;

F.     In the alternative to return of the $1.85 million FMP SA Management paid to redeem the 14% interest in Alamo Furr's, an award of that 14% interest in Alamo Furr's;

G.     Avoiding Buffets' obligations under the 2017 TXFMP Management Agreement and the 2021 VitaNova Management Agreement, pursuant to pursuant to 11 U.S.C. §§ 544(a), 544(b), and 548, and entering judgment against TXFMP and VitaNova for the amounts they received purportedly under those agreements;

H.     Imposing a constructive trust on all assets of Jones, Kemp, Harris, Dayspring, All Jones, Larrac, TXFMP, VitaNova, Cortes, and Calvert that can be traced to the

Debtors' assets, as well as on any and all such funds that those Defendants subsequently transferred to others;

I.      Disallowing the Insider Claims and the Ogletree Claims, pursuant to 11 U.S.C. § 502;

J.      In the alternative to disallowance, offsetting any allowed Insider Claims and Ogletree Claims by the amounts awarded against such claimants herein;

K.      In the alternative to disallowance, equitably subordinating the Insider Claims, pursuant to 11 U.S.C. § 510(c)(1);

L.      Awarding the Trust its costs and, on all claims where available, attorneys' fees incurred herein; and

M.      Such other and further legal and/or equitable relief as the Court deems just and proper under the circumstances.

**RESPECTFULLY SUBMITTED** this 5th day of December, 2022.

**DICKINSON WRIGHT PLLC**

By: */s/ Amanda E. Newman*
Carolyn J. Johnsen
William L. Novotny
Amanda E. Newman
Kathryn E. Gasior
1850 North Central Avenue, Suite 1400
Phoenix, AZ 85004
*Attorneys for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that Notice of this document was electronically filed and served to the parties that are registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District on December 5, 2022.

By: *   /s/ Amanda E. Newman   *

## VERIFICATION

I, David Gonzales, declare under oath and penalty of perjury, that:

1.      I am the Plaintiff in the foregoing Verified First Amended Complaint ("FAC").

2.      I have reviewed the FAC.

3.      I know or believe that all allegations in the FAC that the Plaintiff has personal knowledge of to be true.

4.      I believe the allegations in the FAC that the Plaintiff does not have personal knowledge of to be true based on specified information, documents, or both.

5.      I have authorized the filing of the Complaint.

**DATED:** December 5, 2022.

_____
David Gonzales

4887-2410-5282 v2 [74463-2]

Verif. First. Am. Compl.                    76