

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 4, 2025**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **FRESH ACQUISITIONS, LLC,** *et al.* | **Case No. 21-30721-sgj-11** **(Jointly Administered)** |
| **Post-Confirmation/Liquidating   Debtors.** | |
| **DAVID   GONZALES,   TRUSTEE   OF THE    FRESH    ACQUISITIONS LIQUIDATING TRUST** | |
| Plaintiff. | **Adv. No. 22-3087-sgj** |
| v. | |
| **ALLEN JACKIE JONES, et al.,** | **Civ. Act. No. 3:22-cv-2659-M** |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER:  (A) DECLARING THAT POST-CONFIRMATION LIQUIDATING TRUSTEE'S ENTRY INTO LITIGATION FUNDING AGREEMENT, WITHOUT NOTICE OR COURT AUTHORITY, WAS IMPROPER AND, AS A RESULT, LIQUIDATING TRUST HAS NO CONTRACTUAL OBLIGATION RELATING TO SAME; (B) DIRECTING APPOINTMENT OF A REPLACEMENT POST-CONFIRMATION LIQUIDATING TRUSTEE; AND (C) REQUIRING EXPANDED GLOBAL MEDIATION**

## I.    INTRODUCTION

This order arises in a post-confirmation Chapter 11 context.  It arises against the backdrop of seven post-confirmation adversary proceedings that are being prosecuted by a liquidating plan trustee, as plaintiff (the "Liquidating Trustee").  The seven adversary proceedings have now gone on for approximately three years, at great expense, with no end in sight.  It has been almost four years since a liquidating plan was confirmed.  There has been no distribution to unsecured creditors—nor does one look likely anytime in the near future.  The bankruptcy court recently (on June 5, 2025) held a status conference to inquire as to what might be done to speed things along and to encourage more attempts at mediation. The court learned somewhat inadvertently—in response to its inquiries—that the Liquidating Trustee entered into a *litigation funding agreement*—more than a year after his tenure began as a post-confirmation trustee, without any prior notice (pre- or post-confirmation) to the court or the creditors/trust beneficiaries.  According to certain defendants being sued by him, this litigation funding agreement was hampering the prospect of settlement in the post-confirmation adversary proceedings.

This court was surprised to hear about a litigation funding agreement.  The court never heard about it as a possibility in connection with plan confirmation (or otherwise) nor approved it.  The court has gone back and scoured the bankruptcy court docket, the Disclosure Statement that the court approved, the Plan that the court confirmed, the form of Liquidating Trust Agreement presented as part of the confirmation evidence (as well as the Liquidating Trust Agreement that was ultimately executed), and the Confirmation Order.  Nothing.  As a result of this revelation at the June 5, 2025 status conference, on June 18, 2025, this court issued a *Memorandum and Opinion Requiring Liquidating Trustee to: (A) File Litigation Funding Agreement, Unsealed and Unredacted, on Main Bankruptcy Case Docket; and (B) Appear and Show Cause Regarding His*

*Authority (or Lack Thereof) to Unilaterally Enter Into Such Agreement* ("*Show Cause Order*").

DE # 1112 in main bankruptcy case and DE # 404 in above-referenced adversary proceeding.  The

Liquidating Trustee resisted filing the litigation funding agreement unsealed or without redaction

on the public bankruptcy docket (arguing it was work product or irrelevant), but this court required

it to be filed unsealed and unredacted.

As explained in the *Show Cause Order*, the Liquidating Trustee expressed the view at the

June 5, 2025 status conference that, since the litigation funding agreement was entered into ***post-***

***confirmation***, he was not required to give notice or obtain court approval and there is no problem,

he says, since he controls all litigation decisions (not the litigation funder).

The court held an evidentiary hearing on the *Show Cause Order* on July 30, 2025.  The

court heard further testimony from the Liquidating Trustee and also heard from two expert

witnesses who testified generally about the subject of litigation funding agreements.  Based on the

evidence and arguments, this court has decided that, even though the Liquidating Trustee entered

into the litigation funding agreement post-confirmation—at a time when bankruptcy courts have

less oversight and limited bankruptcy subject matter jurisdiction—he nevertheless acted

improperly, and this court has subject matter jurisdiction to address it.

First, the solicitation package that went out for a creditor vote in the above-referenced

bankruptcy case (i.e., the approved Disclosure Statement, an Exhibit D liquidation analysis

attached thereto, the Plan, and Plan documents), as well as the confirmation evidence presented at

the confirmation hearing, ***did not disclose litigation funding as a possible means to fund post-***

***confirmation litigation***.

Second, the Liquidating Trust Agreement that was submitted as part of the confirmation

hearing did not grant the Liquidating Trustee authority to borrow funds post-confirmation

(although neither the Liquidating Trustee nor litigation funder will refer to the litigation funding

as a "loan").  As a result of this lack of disclosure and lack of authority, the Trust will have no contractual liability to the litigation funder.

Third, even if the Liquidating Trust Agreement did grant broad enough authority to the Liquidating Trustee to enter into a litigation funding agreement, this court cannot possibly find here (given the exorbitantly expensive terms of the litigation funding—later described) that the Liquidating Trustee exercised reasonable business judgment or acted as a prudent fiduciary. Pursuant to Bankruptcy Code sections 105(a) and 1142, and Bankruptcy Rule 3020(d), this court is compelled to conclude that the Liquidating Trustee's entry into the litigation funding agreement was an abuse of discretion, harmful to the creditors/trust beneficiaries, and will order that a new liquidating trustee be promptly appointed in substitution of the current Liquidating Trustee.  While this is not normally something within the purview of the U.S. Trustee (i.e., appointing a post-confirmation trustee), the court is directing the U.S. Trustee's office, pursuant to this court's power under sections 105(a) and 1142(b) and Bankruptcy Rule 3020(d), to appoint a suitable candidate from its list of panel trustees, since there is no oversight committee under the Liquidating Trust Agreement to perform the task of voting on a new trustee, and, in fact, the Liquidating Trust Agreement has an unworkable requirement of a 75% vote of the beneficiaries of the Liquidating Trust to replace the Liquidating Trustee (it is impossible to perform the math on that, since there are still many unresolved proofs of claim, including a $150 million (or more) priority claim of the IRS).

Finally, the court also is ordering an expanded global mediation to occur that shall include not only the new replacement liquidating trustee and the defendants in the seven adversary proceedings, but also the current Liquidating Trustee and his professionals (who may be subject to disgorgement of fees, as set forth herein) as well as the litigation funder (who paid $2.325

million towards these professionals' fees and may want to explore a consensual way to put this mess behind it).[1]

## II.    FINDINGS OF FACT

A.  Timeline.

On **April 20, 2021**, Fresh Acquisitions, LLC and fourteen related entities in the restaurant business (collectively, the "Debtors") filed Chapter 11 bankruptcy cases (collectively, the "Bankruptcy Case").

On **December 20, 2021**, after approving a section 363 sale of substantially all of the assets of the Debtors, the bankruptcy court confirmed a Chapter 11 Plan liquidating plan (the "Plan"), DE # 498, that was proposed by the Official Committee of Unsecured Creditors ("UCC") appointed in the Bankruptcy Case. *See* the "Confirmation Order." DE # 586. The Plan was a typical liquidating "pot plan," pursuant to which a trust (the "Liquidating Trust" or "Trust") was created, and an individual named David Gonzales, with a firm called Caliber Advisors, LLC in Scottsdale, Arizona, was selected to be the Liquidating Trustee. Mr. Gonzales had been a financial advisor to the UCC pre-petition, and apparently the UCC wanted him to serve as the Liquidating Trustee because he was already somewhat familiar with issues that would be litigated post-confirmation. The Debtors, in opposition, had argued that conversion to a Chapter 7 case, after the sale, would be a more cost-efficient way to wind down the estate than the UCC Plan. Not surprisingly, the UCC disagreed. The UCC's Disclosure Statement that the court approved, in the section entitled "XII. Liquidation Analysis, Best Interest of Creditors," stated:

> *The Committee believes that the orderly liquidation proposed under the Plan is likely to generate greater distributions to creditors than would occur in a Chapter 7 liquidation. **Here, the Liquidating Trustee is extremely familiar with the structure of the Debtors' past operations and has already prepared a comprehensive claims analysis**. He has already testified in the Bankruptcy Court*

---

[1] The litigation funder did show up and participate in a constructive way at the Show Cause Hearing.

> *at length about the potential Causes of Action and has gained momentum in developing a necessary strategy for pursuing litigation. **This will save cost [sic] in having a new trustee and new counsel enter into the case and virtually start over. As shown on Exhibit D, the costs of the Litigation Trustee will be a total of $600,000 over the estimated five-year term of the Plan. Payments to a Chapter 7 trustee calculated under Section 326 of the Bankruptcy Code would be a higher amount at about $625,000.** Certainly, claimants will receive Distributions under the Plan of at least as much as they would receive in a Chapter 7 liquidation and thus, the Plan meets the best interests of creditors test.*
>
> *The Debtors believe a Chapter 7 liquidation may be more efficient and less costly, and the Chapter 7 trustee is more likely than not to retain Committee professionals to minimize delay and maximize the Committee's purported momentum. The Committee believes that there are no assurances that a Chapter 7 trustee would invest the effort to pursue the Causes of Action to the extent that the Liquidating Trustee would pursue them. It seems much more likely that he/she would hire local professionals with whom he/she has worked with in the past.*

DE # 499, pp 45-46 (emphasis added). The Exhibit D that was attached estimated overall "Litigation Costs" between $150,000 and $350,000 per year. Exhibit D also estimated "Trustee Costs" at $120,000 year (a $10,000 flat fee per month for the Liquidating Trustee). It estimated "Accounting and other" costs at $100,000 the first year of the Plan, and then $60,000 per year thereafter. The Plan was projected to be five years in duration, during which there would be $6.7 million in payments made to priority tax claimants (which would be a 100% dividend) and $9,650,198 in payments to general unsecured creditors (which would be an estimated 13% dividend). To be clear, the UCC's Disclosure Statement and Plan estimated a 5-year period to liquidate the Causes of Action. DE # 499, p. 30. As explained below, things have not turned out remotely close to this forecast by the UCC and its professionals.

The Plan went effective on January 4, 2022. DE # 591. In accordance with the terms of the Plan, the Confirmation Order, and the Fresh Acquisitions Liquidating Trust Agreement (the "Liquidating Trust Agreement"), all of the Debtors' assets, as defined in section 541 of the Bankruptcy Code, including "Causes of Action," were transferred to and vested in the Liquidating Trust. The Liquidating Trustee was granted standing to prosecute the Causes of Action.

On the effective date of the Plan, the holders of general unsecured claims against the substantively consolidated Debtors received a pro-rata beneficial interest in the Liquidating Trust "in full and final satisfaction" of their claims.  The Liquidating Trust received a sum of cash (approximately $345,000[2]) to seed the trust.  In reviewing the Liquidating Trust Agreement [DE # 499-1, Ex. C], the court now observes, with regret, that **there was no "Oversight Committee" of trust beneficiaries**, as we typically see, so as to provide a type of "corporate governance" to the Liquidating Trustee.  The court is not sure why.  The Liquidating Trustee makes decisions for the Trust beneficiaries (the holders of administrative, priority, and unsecured claims) and 75% of that group can vote to remove or replace the Liquidating Trustee.

The Liquidating Trustee (David Gonzales, the former financial advisor to the UCC) immediately took on his role as of the Effective Date of the Plan and hired the former lawyers for the UCC to represent him (Dickinson Wright PLLC).

 On **September 12, 2022**, approximately nine months after confirmation, despite the Liquidating Trustee being **"extremely familiar with the structure of the Debtors' past operations"** and having **"already prepared a comprehensive claims analysis"** and having **"gained momentum in developing a necessary strategy for pursuing litigation,"** he finally got around to filing the above-referenced Adversary Proceeding ("Original Adversary Proceeding").  The long-awaited original complaint was 71-pages long, plus eight exhibits, and it named 22 defendants (plus additional "John and Jane Does" and other unknown, fictitious entities) and set forth 27 causes of action.  These 27 causes of action (which were mostly, if not entirely, alleged against "insiders" or "affiliates" of the Debtors) ranged from alleged fraudulent transfers, to mismanagement, to breach of fiduciary duties, to misappropriation of government PPP funds, and numerous other torts

---

[2] *See Declaration of David Gonzales*, p.3, ¶ 20. DE # 1126-1.

and remedies.  The court soon ordered severance—in other words, a carving up of the Original Adversary Proceeding into seven different adversary proceedings (the "Seven Adversary Proceedings"),[3] after numerous defendants argued that the complaint filed in the Original Adversary Proceeding contained improper "group pleading" (in other words, there were broad allegations against the general group of defendants in the Original Adversary Proceeding without giving clear notice regarding which allegations and claims were being asserted against whom).

On **July 6, 2023**, ten months after filing the Original Adversary Proceeding, the Liquidating Trustee filed separate "amended" complaints in each of the Seven Adversary Proceedings.  Thereafter, in these Seven Adversary Proceedings, the court has seen:  (a) motions to withdraw the reference and jury demands (and joinders) filed by certain of the 22 defendants (which were granted, since the defendants clearly had jury trial rights, although the bankruptcy court was designated to handle pre-trial matters); (b) Rule 12(b)(6) motions to dismiss from virtually every single defendant (none were granted); (c) numerous discovery disputes (instigated with motions to compel and motions for protective orders); (d) *Daubert* motions; and (e) 15 separate motions and cross-motions for summary judgment (each of which included 3,000+ pages of aggregate appendices).  The six cross motions for summary judgment that the court has ruled upon thus far (in three of the Seven Adversary Proceedings) have been denied,[4] meaning that at least three of the Seven Adversary Proceedings will go to jury trial.  It seems likely that all Seven Adversary Proceedings will go to trial. Meanwhile, the District Judge who is assigned to preside over the ultimate jury trials has recently retired.

---

[3] The six new adversary proceedings created were Adversary Proceeding Nos. 23-03054, 23-03055, 23-03056, 23-03057, 23-03058, and 23-03059.

[4] The defendant's motions for summary judgment as to plaintiff's conspiracy to commit fraudulent transfer claim in each of the three adversary proceedings were granted. *See Memorandum Opinion and Order Denying Cross-Motions for Summary Judgment as to Plaintiff's Fraudulent Transfer Claims and Granting Defendant's Motion for Summary Judgment as to Plaintiff's Conspiracy to Commit Fraudulent Transfer Claim.* DE # 130 (23-03054), DE # 125 (23-03055 and 23-03056).

On **May 3, 2023** (yes, we are going backwards in time now), three months before the Original Adversary Proceeding was separated into the Seven Adversary Proceedings, and unbeknownst to the court or creditors/trust beneficiaries, the Liquidating Trustee entered into a **"Master Prepaid Forward Purchase Agreement by and Between Litchfield Ventures, LLC and Fresh Acquisitions Liquidating Trust,** which was then amended on **October 9, 2024** (collectively, the "Litigation Funding Agreement"). Nothing was filed on the docket to disclose this, nor did Gonzales disclose to the trust beneficiaries at any time prior to entering into the Litigation Funding Agreement that he would be doing so.

On **August 22, 2024** (now, coming up on three years since plan confirmation, and 15 months after entry into the Litigation Funding Agreement) the Liquidating Trustee filed a "Notice of Trustee's Status Report to Beneficiaries" (Status Report)." DE # 1097. The Status Report was extremely dense with information and legal advocacy regarding the Causes of Action against the numerous defendants and the Liquidating Trustee's "stunning discovery finds." Buried in the Status Report (which is 15 pages, plus 7 pages of rather sensational email attachments), there is one sentence that generically references the fact that the Liquidating Trustee had obtained litigation financing. Specifically, after noting that the Debtors' "Owners" were and are "covered by a $2 million D&O policy paying all of their legal fees," the Status Report stated: "The Trustee countered this strategy by securing litigation financing that he believes will be ample to withstand a full trial if necessary." DE # 1097, p. 5 (middle of paragraph 8). That's it.

On **June 5, 2025,** the court had *sua sponte* set a status conference for the simple reason of exploring what might be done to hurry along the Liquidating Trustee's Seven Adversary Proceedings—including having a discussion regarding more mediation (it was attempted unsuccessfully once before). As noted earlier, the court learned, to its surprise, that ***the***

***Liquidating Trustee*** had entered into the Litigation Funding Agreement post-confirmation and that the agreement—according to some defendants—was hampering the prospect of a settlement.

On **June 16, 2025**, the court was presented, over the objection of the Liquidating Trustee, with a copy of the Litigation Funding Agreement.  The court certainly understands that not all litigation funding agreements are the same.  Presumably, sometimes law firms simply enter into them directly with funders, and the funding might not be that remarkable (for example, the litigation funder might share in a law firm's contingency fee—assuming that is legal in a particular state).  The litigation funding is likely, generally pricey, because of the inherent risks and the typically non-recourse nature of it. But the Litigation Funding Agreement here seemed rather amazing to the court.  As noted earlier, the term "Forward Purchaser" is used, rather than the term "funder" or "lender."  The Liquidating Trustee is referred to as "Forward Seller."  It indicates that it is governed by Delaware law.  There is no mention of the bankruptcy court or case number.  The Litigation Funding Agreement does at least indicate that the Liquidating Trustee has the sole and exclusive right to settle any claim (and the court notes that the approved Disclosure Statement indicated that post-confirmation settlements in excess of $100,000 must be presented to the bankruptcy court for approval).  DE # 499 at p. 36.  But, the Liquidating Trustee has to provide all details about any settlement to the litigation funder (i.e., the "Forward Purchaser") in writing within two business days (details include such things as offers, demands, proposals, and substance of discussions).  So, I guess one might say there were two stages of vetting that the Liquidating Trustee needed to go through before finalizing any settlement: first, with the litigation funder; then, with the bankruptcy judge.   As far as pricing, there is a guaranteed funding commitment of $2,325,000 (all of which has now been funded).  The promised "return" to the litigation funder is three multiplied by whatever the ***litigation funder*** funds (here, that would be $6,975,000), plus a

12% return[5] on the difference between the overall litigation proceeds and $6,975,000.  If there is a default, the "Default Rate" of interest to be charged is 20% per annum compounded monthly.

Using a hypothetical, if ***tomorrow***, the Liquidating Trustee won (or obtained through a settlement) litigation proceeds of **$10 million**, the litigation funder would receive $6,975,000 **plus** 12% of $3,025,000 (the difference between $10 million and $6,975,000) which would equal another **$363,000**.   Thus, **$7,338,000** on a **$2,325,000** investment.[6]   This would leave only **$2,662,000** for the Liquidating Trustee to use toward paying creditors in the context of a $10 million verdict or settlement.  As shown further in Part II.B. below, the Liquidating Trustee's counsel is currently owed **$2,126,278.09** in unpaid fees (even after being paid handsomely with the previously undisclosed litigation funding). Thus, this would actually mean approximately **$500,000** being available for prepetition creditors in the context of a **$10 million** verdict/settlement that occurs tomorrow.

Using another hypothetical, if ***tomorrow***, the Liquidating Trustee realized litigation proceeds of $30 million, the litigation funder would receive $6,975,000 **plus** 12% of $23,025,000 (the difference between $30 million and $6,975,000) which would equal another $2,763,000. Thus, **$9,738,000** on a **$2,325,000** investment.[7]  The Liquidating Trustee in this scenario of a **$30 million** verdict/settlement tomorrow realizes **$10,262,000** for him, his professionals, and thereafter the prepetition creditors. Again, as shown further in Part II.B. below, the Liquidating Trustee's counsel is currently owed $2,126,278.09 in unpaid fees (even after being paid handsomely with the previously undisclosed litigation funding). Thus, this would actually mean approximately

---

[5] This was increased from an original 8% in the October 9, 2024 Amendment to the Litigation Funding Agreement.

[6] *See* DE # 415, p.11 of 29 in Adv. Proc. No. 22-3087.

[7] *See* DE # 415, p.11 of 29 in Adv. Proc. No. 22-3087.

**$8,135,721.91** being available for prepetition creditors in the context of a **$30 million** verdict/settlement tomorrow.

Using still another hypothetical, if *tomorrow*, the Liquidating Trustee realized litigation proceeds of $20 million, the litigation funder would receive $6,975,000 **plus** 12% of $13,025,000 (the difference between $20 million and $6,975,000) which would equal another $1,563,000. Thus, **$8,538,000** on a **$2,325,000** investment. The Liquidating Trustee in this scenario of a **$20 million** verdict/settlement tomorrow realizes **$11,462,000** for him, his professionals, and thereafter the prepetition creditors. Again, as shown further in Part II.B. below, the Liquidating Trustee's counsel is currently owed $2,126,278.09 in unpaid fees (even after being paid handsomely with the previously undisclosed litigation funding). Thus, this would actually mean approximately **$9,335,721.91** being available for prepetition creditors in the context of a **$20 million** verdict/settlement tomorrow.

Obviously, the Liquidating Trustee (and the creditors), as well as the litigation funder, do better if a very large verdict/settlement is obtained. The problem here, among others, is that there is no settlement/verdict that is going to happen *tomorrow*. And the litigation funding has run out. And the Liquidating Trustee and his counsel continue to accumulate fees. Other random observations: (1) a broker named Fincorp Associates, LLC (individual name Les Baer) obtained a $75,000 broker fee for arranging the litigation funding (this was not disclosed anywhere before being disclosed, generically, in Gonzales's declaration filed in response to the court's Show Cause Order in which he discloses the payment of a "small" and "modest" (but unspecified amount) broker fee); (2) the Liquidating Trustee gave the litigation funder a security interest in the litigation proceeds and the claims themselves; (3) the Liquidating Trustee must consult with the litigation funder regarding any new counsel brought in; and (4) there are indemnities provided by the Liquidating Trustee to the litigation funder.

On **June 18, 2025**, the court issued the Show Cause Order which ordered the Liquidating Trustee to appear on July 30, 2025 at 1:30 p.m. before the bankruptcy court and show cause ("Show Cause Hearing") as to whether his entry into the Litigation Funding Agreement was legally proper (presenting all arguments as to why—despite an apparent lack of disclosure in the Disclosure Statement and lack of authority in the Liquidating Trust Agreement) and also whether the Litigation Funding Agreement was entered into in the exercise of reasonable business judgment. The Show Cause Order indicated that the Liquidating Trustee would be permitted to put on any testimony regarding whether the Litigation Funding Agreement reflects reasonable market terms and whether (unbeknownst to the court) this is a standard practice of post-confirmation Chapter 11 trustees (i.e., entering into a litigation funding agreement post-confirmation and, in particular, doing this without any foreshadowing to the court or creditors at least pre-confirmation, in connection with plan confirmation). The Show Cause Order indicated that the court would consider all remedies, potential sanctions, and potentially an order voiding the Litigation Funding Agreement, depending on the argument and evidence of the Liquidating Trustee.

B. The Liquidating Trustee's Professional Fees and Costs, Post-Confirmation.

While the Liquidating Trustee's counsel was not required to file fee applications during this post-confirmation phase of the case (which is, of course, not unusual post-confirmation in Chapter 11), the court entered a "*Sua Sponte Order Directing Fee Reporting by the Liquidating Trustee*" on May 13, 2022—even before the Original Adversary Proceeding was filed—after former Debtors' counsel raised concern about the Liquidating Trustee's overzealous litigation tactics in a contested matter. The latest report filed by the Liquidating Trustee shows the following pertinent information: (a) Liquidating Trustee's counsel has been paid **$2,215,908.49** for post-confirmation fees and expenses (but it has billed/incurred a total of **$4,342,186.58**; thus, Dickinson Wright PLLC is owed **$2,126,278.09** currently—and the Seven Adversary Proceedings are

nowhere close to going to jury trial); (b) the Liquidating Trustee's financial advisory firm Caliber, of which the Liquidating Trustee is the only employee, has been paid **$371,737.80** for post-confirmation fees and expenses (it has billed $380,212.80)—and this is in addition to the Liquidating Trustee's individual $10,000 flat monthly fee, for which he has been paid **$330,000** (thus, a total of **$701,737** paid to the Liquidating Trustee and his one-man firm); (c) other professionals (tax accountant and a firm handling a contract matter of some sort) have cumulatively been paid **$13,214**).  DE # 1111.  **Roughly $3 million paid (with at least $2,126,278.09 unpaid)**. The fees and expenses have been funded mostly from the Litigation Funding since, as noted earlier, the Liquidating Trust was seeded with only $345,000 cash and has only received a few hundred thousand dollars in settlements.[8]

C.      The Liquidating Trustee's Testimony and the Plan Documents.

The Liquidating Trustee testified at the *Show Cause Hearing* on July 30, 2025, that he has served as a trustee in bankruptcy approximately a half-dozen times (although he has years of collection experience as a banker).  He represented that he believed, based on advice of counsel, that he had no obligation to disclose the Litigation Funding Agreement and no need to obtain court approval.  He also testified that he never even considered entering into any litigation funding until around December 2022 or January 2023 (more than a year after confirmation) when the defendants in the Original Adversary Proceeding started putting up strong resistance. As a reminder, the Original Adversary Proceeding complaint was 71-pages long, plus eight exhibits, and it named 22 defendants (mostly or entirely insiders) and set forth 27 causes of action.  It asserted $100 million in damages.  The testimony and argument at the confirmation hearing had been that Mr. Gonzales

---

[8] Per Gonzales's declaration, the Trust had recovered approximately $670,000 in "preferences, settlements, reimbursements and refunds." DE # 1126-1, pp. 3-4, ¶ 20. The court notes that this amount is nearly twice the $375,000 amount disclosed by the Liquidating Trustee in his August 22, 2024 Status Report as having been recovered by him from his post-confirmation settlements/litigation since his appointment in January 2022. DE # 402, ¶ 6.

was up-to-speed on the claims and theories.  It seems shocking to this court that he would not have anticipated massive resistance to a $100 million adversary proceeding, asserting 27 causes of action, against 22 defendants. In any event, Mr. Gonzales testified that he had never used litigation funding in the past.  He testified that he never reached out to any local counsel in the Northern District of Texas to see if they might accept representation of him on a contingency basis.  The former UCC counsel (Dickinson Wright PLLC), that he hired post-confirmation—that seemed so eager and willing to represent him at confirmation—apparently, did not want to be employed on a contingency basis.  He believes that the Litigation Funding Agreement presents market-based terms.  He hired a broker at a cost of $75,000 to connect him to a litigation funder.  He did not anticipate that the litigation costs, post-confirmation, would ever grow as large as they have— which happened because of the allegedly unanticipated resistance from the defendants in the Seven Adversary Proceedings.  The Liquidating Trustee and his counsel still believe that they will win big and that there will be an eventual payout to unsecured creditors.   But meanwhile, the Liquidating Trustee acknowledges that ***he has not yet objected to several IRS proofs of claim that total at least $150 million in amount (priority)***.   When pressed whether, ultimately, general unsecured creditors might perhaps receive no distribution, for the reason of these IRS claims alone, he testified that he believed the IRS's proofs of claim will be allowed at zero in amount, but he has not been able to afford to hire accountants to sort it out.  When asked about his firm Caliber's receipt of **$371,737.80** for post-confirmation fees and expenses, on top of his $330,000 individual fees (flat $10,000 per month for 33 months), he testified that this was for independent contractors he hired that were CPAs and were helping with other proof of claim objections (not the IRS). However, they had done nothing to work on the IRS's massive claims.  Moreover, video deposition testimony was played where he had testified inconsistently from the testimony at the Show Cause

Hearing (with regard to whether there were any Caliber employees or contractors assisting him in this Bankruptcy Case at all).

A careful review of the Disclosure Statement, the Plan, the Confirmation Order, and the Liquidating Trust Agreement show that there was no hint of ***the possibility of*** litigation funding— nothing that this court can find to put the court or creditors on notice of it being a possibility that might impact distributions to creditors under the Plan (note that 106 creditors cast ballots in favor of the Plan and 7 creditors cast ballots to reject the Plan). There are well over a dozen provisions in these collective documents that might be considered pertinent.  In the Disclosure Statement, Article VI.D., states that "The Liquidating Trust's professionals shall be compensated at their respective hourly rates or on a contingency fee basis as agreed to by the Liquidating Trustee, without further motion, application notice, or other order of the Court.  The fees and expenses of the Liquidating Trust's professionals ***shall be satisfied from the Liquidating Trust Assets***." (Emphasis added). The Plan defines "Liquidating Trust Assets" as "all of the Debtors' Assets transferred to the Liquidating Trust."  The Plan further states, at Article I, Section 7, that the "fees and expenses of the Professionals ***shall be paid from the Liquidating Trust Assets***." (Emphasis added.)  There is also a defined term in the Plan for "Liquidating Trust Administrative Reserves" defined as cash "in an amount necessary to satisfy reasonable costs and expenses of the Liquidating Trustee," and it shows no hint of supplementation of it with litigation funding.   Finally, as noted earlier, very pertinent is the Exhibit D attached to the Disclosure Statement that showed "Projected Cash Available for Distribution."  It showed projected "Litigation Costs" ranging from $150,000 to $350,000 per year over five years (along with Trustee's monthly fee amounting to $120,000 per year).

The Liquidating Trustee counters that the Liquidating Trust Agreement provided at Article IV, paragraph 7, that "the Liquidating Trustee shall not be required to obtain any approvals from

the Bankruptcy Court . . . and/or provide notice . . . to implement the terms of this Liquidating

Trust Agreement, including, without limitation, the sale, transfer, disposal or contribution of any

Liquidating Trust Assets retained by the Liquidating Trust . . .”  The Liquidating Trustee says that

the Litigation Funding Agreement is similar in nature to a “sale” or “transfer” of the Liquidating

Trust Assets (in that it is essentially a sale of future proceeds therefrom, or a “waterfall” therefrom,

in exchange for immediate cash).  This court disagrees.  The litigation funder here represents that

it uses the title “Master Prepaid Forward Purchase Agreement” on the Litigation Funding

Agreement for “tax and structural reasons” (suggesting that the funding is deemed to be an upfront

prepayment for a purchase of litigation proceeds with the actual sale being settled at a future date

when the litigation proceeds are realized).  DE # 415 in Adv. Proc. No. 22-3087, p. 14 of 19.

Whatever tax or other motivations exist here, the litigation funder was, in essence, providing

capital in exchange for a later, hoped-for return.  The litigation funder took a security interest in

the claims and proceeds (the court is not aware if it was perfected).  This was not anything

contemplated in the Plan documents (including the draft Liquidating Trust Agreement) that went

out for a creditor vote.[9]  Moreover, to the extent the Liquidating Trust Agreement is ambiguous

on this point, the ambiguity must be construed against the drafter of it (i.e., the Liquidating Trustee

and his counsel).

     D. The Expert Witness Testimony.

     The litigation funder here, Litchfield Ventures, LLC (“Litchfield”), is an affiliate of GLS

Capital, LLC (“GLS”).  Litchfield was created for the specific litigation funding involved here.

---

[9] *Contrast* the different approach taken in the Sears Chapter 11 bankruptcy case.  Motion of the Official Committee of Unsecured Creditors for Entry of an Order . . . Authorizing Entry by the Debtors’ Estates Into The Litigation Funding Arrangement with Benchmark 21p, L.P., ¶ 44, [DE # 10407],] in *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Apr. 21, 2022) (noting that the Liquidating Trust Agreement approved under the chapter 11 plan authorized the Liquidating Trust Board created thereunder to incur financing to pursue litigation).

Litchfield has its own investors—the court did not inquire who they are.[10]  GLS has been in existence since 2018 and is based in Chicago.  It is apparently an active player in the commercial litigation funding industry, and it represented that it had never met the Liquidating Trustee or had any relationship with the relevant attorneys at Dickinson Wright PLLC.  Prior to this, it had no familiarity with these Debtors or the bankruptcy.

Litchfield presented expert testimony from two experts in the field of litigation funding agreements.  One was a law professor (Professor Tom Baker from University of Pennsylvania), and the other was a director at the global investment bank known as Stout Risius Ross, LLC (Joel E. Cohen).  Both witnesses seemed knowledgeable regarding litigation funding agreements and seemed to acknowledge that litigation funding is an expensive product because of the risks involved (i.e., the non-recourse nature of it and the general uncertainty and delay of various litigation outcomes).  They seem to think that the Litigation Funding Agreement here was within a standard range of market terms for these types of agreements.  While the court has little doubt that these witnesses are very knowledgeable, one witness (Baker) testified that he had probably seen a "handful" of these agreements in his lifetime (because they are rarely made public).  He knows about market terms from his "research and teaching" and from talking to participants in the industry.  The other witness (Cohen) testified that he similarly had only seen a few actual litigation funding agreements.  ***It is hard for a judge to determine if something is reasonable or within normal market terms when the experts admit that they have not seen too many***.  Certainly, there has been commentary about the opacity of litigation funding agreements.  *See* Samir Parikh, *Opaque Capital and Mass-Tort Financing*, Yale L.J. Forum (Oct. 2023).  They are rarely filed

---

[10] The court believes it could have. *See* ND TX LR 3.1(c) (local District Court Rule requiring a "Certificate of Interested Persons" to be filed with a civil complaint, which includes "legal entities that are financially interested in the outcome of the case").

on court dockets.  Sometimes they are even protected from discovery.  *See, e.g., Fleet Connect Sols LLC v. Waste Connections US, Inc.*, No. 2:21-CV-00365-JRG, 2022 U.S. Dist. LEXIS 1292167, at *7 (E.D. Tex. June 29, 2022); *In re DesignLine Corp.*, 565 B.R. 341, 344 (Bankr. W.D. N.C. 2017) (describing the trustee's ongoing efforts to seal information relating to litigation funding arrangement and the court's ultimate ruling that permitted shielding only of the proposed litigation budget); *In re Superior Nat. Ins. Gr.*, 2014 WL 51128, at *4 (Bankr. C.D. Cal. 2014) (requiring disclosure of litigation financing arrangement but permitting the trustee to seal terms relating to the amount of financing and how the money is to be used).  *But see Dean v. Seidel*, 2021 WL 1541550, at *2 (N.D. Tex. 2021) (litigation funding agreement approved when presented with trustee's motion to employ special litigation counsel; appeal to Fifth Circuit was dismissed for appellant's lack of standing).  *See generally* Kara Bruce, *The Promise and Peril of Third-Party Litigation Finance in Bankruptcy*, 44 No. 4 Bankr. Law Letter NL 1 (Apr. 2024) (for an extensive discussion of these issues).

### III.    CONCLUSIONS OF LAW

#### A.    Bankruptcy Subject Matter Jurisdiction.

The court had bankruptcy subject matter jurisdiction to issue the *Show Cause Order* and to have conducted the *Show Cause Hearing*, pursuant to 28 U.S.C. §§ 1334 & 157—despite it being close to four years post-confirmation—since the issues involved bear on the interpretation, execution, and/or implementation of a confirmed plan.  The Fifth Circuit has stated that, while bankruptcy subject matter jurisdiction is broad, it narrows once the debtor confirms its reorganization plan, because confirmation dissolves the debtor's bankruptcy estate.  It has further elaborated that "related to" bankruptcy subject matter jurisdiction, post-confirmation, narrows to "matters pertaining to the implementation or execution of the plan."  *In re GenOn Mid-Atlantic Development, L.L.C.,* 42 F.4th 523, 534 (5th Cir. 2022); *In re Enron*, 535 F.3d 325, 335 (5th Cir.

2008); *Craig's Stores of Tex., Inc. v. Bank of La. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388,

390 (5th Cir. 2001). *See also U.S. Brass Corp. v. Travelers Ins. Grp. (In re U.S. Brass Corp.)*, 301

F.3d 296, 304 (5th Cir. 2002); *In re Chesapeake Energy Corporation*, 70 F.4th 273 (5th Cir. 2023).

There can also be "related to" post-confirmation bankruptcy subject matter jurisdiction in

a situation in which a bankruptcy court seeks to enforce one of its orders. *Galaz v. Katona (In re

Galaz)*, 841 F.3d 316, 322-23 (5th Cir. 2016).  Enforcement of prior orders of the bankruptcy court

is implicated here.  The bankruptcy court issued an order during the Bankruptcy Case approving

the Disclosure Statement as adequate that never disclosed the possibility of litigation funding and

its potential, significant impact on creditor recoveries.  The bankruptcy court similarly issued an

order during the Bankruptcy Case approving the UCC's Plan and Liquidating Trust Agreement

which never contemplated the possibility of litigation funding.

The Plan in this Bankruptcy Case also happened to contain typical "Retention of

Jurisdiction" provisions at Article VIII.

B.    Lack of Disclosure and Authority.

As set forth above, there was no disclosure to voting creditors that a tranche of large

litigation funding might come ahead of them in payment.  This is troubling from a section 1125

perspective.  The Plan documents simply were silent on this point and that is unacceptable.  In

addition to lack of disclosure, the Liquidating Trust Agreement is not worded in a way that

contemplated giving the Liquidating Trustee this authority.

C.    Lack of Reasonable Business Judgment.

In any event, it is impossible for this court to find or conclude that that Litigation Funding

Agreement here (even if the Liquidating Trustee had authority to enter into it—which he did not)

was entered into in the exercise of reasonable business judgment, or reflected the actions of a

prudent fiduciary.  The hypotheticals shown earlier show the net recovery to the Liquidating

Trustee at a $10 million, $20 million, or $30 million settlement/verdict.  The problem is that neither a settlement nor a verdict is anywhere on the horizon; the litigation funding is exhausted; the Liquidating Trustee's professionals are owed millions and will presumably continue to accrue millions; and there remain pending $150 million-plus in priority IRS claims that the Liquidating Trustee feels will be favorably resolved, but he has not hired tax experts yet to say that with certainly.  This is not good.

The court is mindful of the wise words from Judge Posner of the Seventh Circuit many years ago, in a slightly different context (involving a Chapter 7 trustee):

> The . . . trustee's case . . . invites consideration of ***the exercise of litigation judgment*** by a Chapter 7 trustee. The filing of lawsuits by a going concern is properly inhibited by concern for future relations with suppliers, customers, creditors, and other persons with whom the firm deals (including government) and by the cost of litigation. The trustee of a defunct enterprise does not have the same inhibitions. A related point is that while the management of a going concern has many other duties besides bringing lawsuits, the trustee of a defunct business has little to do besides filing claims that if resisted he may decide to sue to enforce. ***Judges must therefore be vigilant in policing the litigation judgment exercised by trustees in bankruptcy***, and in an appropriate case must give consideration to imposing sanctions for the filing of a frivolous suit. The Bankruptcy Code forbids reimbursing trustees for expenses incurred in actions not "reasonably likely to benefit the debtor's estate," 11 U.S.C. § 330(a)(4)(A)(ii)(I), and authorizes an "appropriate sanction" against parties who file such a claim. Bankruptcy Rule 9011(b)(2), (c)(1)(B); *In re Bryson*, 131 F.3d 601, 603–04 (7th Cir. 1997); *In re Cohoes Industrial Terminal, Inc.*, 931 F.2d 222, 227 (2d Cir. 1991). Not "reasonably likely to benefit the debtor's estate" may well be a correct description of this suit.

*Maxwell v. KPMG, LLP,* 520 F.3d 713, 718 (7th Cir. 2008) (emphasis added).  Here, the issue is different than in the *Maxwell* case (the court does not believe that the Liquidating Trustee has brought frivolous claims), but the Liquidating Trustee's litigation judgment is still implicated.  The Liquidating Trustee obtained litigation funding ***without adequate disclosure to creditors and the court or authority***.  And it is very expensive.   ***This is bankruptcy where creditor recoveries are of paramount concern***.  The creditors in this case were warned that their ultimate recovery was

uncertain.  But they were advised in the Disclosure Statement that the projected professional fees would run from $150,000 to $350,000 per year, and they were never told that the Liquidating Trustee might pledge their recoveries in favor of pricey financing if things did not go according to plan.  When the Liquidating Trustee pivoted to the pricey litigation funding, it was done with no transparency.  Transparency is a hallmark of bankruptcy.  As the court indicated at the June 5, 2025 status conference, the court is having trouble seeing how "the juice will ever be worth the squeeze" here. It would appear that the unapproved Litigation Funding Agreement has ensured that.

For the reasons set forth above:

**IT IS ORDERED** that the Liquidating Trustee acted improperly by entering into the Litigation Funding Agreement without there being a disclosure of it as a possible means to fund post-confirmation litigation, as required by Bankruptcy Code section 1125.

**IT IS FURTHER ORDERED** that the Liquidating Trust Agreement did not grant the Liquidating Trustee authority to borrow funds post-confirmation or undertake litigation funding.

**IT IS FURTHER ORDERED** that, as a result of this lack of disclosure and lack of authority, the Liquidating Trust has no contractual liability to the litigation funder.

**IT IS FURTHER ORDERED** that, even if the Liquidating Trust Agreement did grant broad enough authority to the Liquidating Trustee to enter into a litigation funding agreement, the Liquidating Trustee did not exercise reasonable business judgment or act as a prudent fiduciary here, given the exorbitantly expensive terms of the litigation funding.

**IT IS FURTHER ORDERED** that the Liquidating Trustee's entry into the litigation funding agreement was an abuse of discretion, harmful to the creditors/trust beneficiaries, not permitted under the terms of the Confirmation Order, the Disclosure Statement, the Plan, or the Liquidating Trust Agreement, and constituted an abuse of the bankruptcy process.

**IT IS FURTHER ORDERED** that, in order to enforce its prior orders and to prevent an abuse of process, a new liquidating trustee shall be promptly appointed in substitution of the current Liquidating Trustee. While this is not normally something within the purview of the U.S. Trustee (i.e., appointing a post-confirmation trustee), the court is directing it, pursuant to this court's power under sections 105(a) and 1142(b) and Bankruptcy Rule 3020(d), to appoint a suitable candidate from its list of panel trustees, since there is no oversight committee under the Liquidating Trust Agreement to perform the task of voting on a new trustee, and, in fact, the Liquidating Trust Agreement has an unworkable requirement of a 75% vote of the beneficiaries of the Liquidating Trust to replace the Liquidating Trustee.

**IT IS FURTHER ORDERED** that the following parties shall engage in an expanded global mediation as soon as practicable: the new replacement liquidating trustee; the defendants in the Seven Adversary Proceedings; the current Liquidating Trustee, David Gonzales, and his professionals including Caliber and Dickinson Wright PLLC (who may all be subject to disgorgement of fees); and Litchfield, the litigation funder.

**###END OF MEMORANDUM OPINION AND ORDER###**